## STOVER DELIVERY SYSTEMS, INC., Appellant,

v.

## DIVISION OF EMPLOYMENT SECURITY, Respondent.

### No. WD 56750.

Missouri Court of Appeals, Western District.

Nov. 30, 1999.

Motion for Rehearing and/or Transfer to Supreme Court Denied Feb. 1, 2000.

Application for Transfer Denied March 21, 2000.

Michael G. Berry, Jefferson City, for appellant.

Alan J. Downs, St. Louis, for respondent.

Before ALBERT A. RIEDERER, Presiding Judge, JAMES M. SMART, Judge.

1. All statutory references are to RSMo (1994) unless otherwise specified.

2. TTC reports all employees for all client employers on a single contribution and wage

ELLIS, Judge.

This appeal involves the question of whether certain delivery drivers for Stover Delivery Systems, Inc. (Stover) are considered "employees" of Stover pursuant to § 288.034.5 [1] for purposes of payment of unemployment insurance taxes.

Stover Delivery Systems, Inc. (Stover) operates nationwide as a courier, collecting and carrying medical specimens from physicians' offices and hospitals for delivery to laboratories. At incorporation, Stover Delivery Systems succeeded a sole proprietorship of Matt Stover. The corporation consisted of two employees of record: Matt Stover, president, and his wife, Brenda Stover, secretary, the two corporate officers. The company utilizes pickup and delivery drivers to transport specimens for various clients. Of the drivers, some were classified by Stover as "employees," while some were classified as "independent contractors."

Debra Quinn, James Smith and James Haage worked for Stover in disputed capacities from January 1, 1995 through 1996 or 1997. All filed for unemployment compensation in 1997, prompting a denial of benefits by Stover based on its assertion that the drivers were independent contractors. An audit and investigation by the Missouri Division of Employment Security (Division) followed. The audit determined that Debra Quinn was an employee of Stover, the determination was undisputed, and Stover paid the assessed tax. The Division's subsequent investigation on the Smith and Haage cases determined that some drivers maintaining Stover's delivery routes were reported as employees of TTC, Illinois, Inc., a lessor employer, but paid directly by Stover.[2] When its auditor followed up for clarification of the drivers' status, the Division was unable to obtain

report, making it impossible to determine which employees are leased to individual clients.

additional information about the nature of the arrangement from either Stover or its counsel despite numerous requests and a subpoena. On September 22, 1997, the Division issued its determination that four drivers, including Smith and Haage, and "others similarly situated" were employees of Stover as defined in § 288.034.5 since January 1, 1995, that the remuneration paid to said drivers constituted "wages" as defined in § 288.036.1, that the wages were not reported as required, and assessing back taxes against Stover. The Division also determined that drivers Smith and Haage were entitled to wage credits based on services performed for wages in employment by Stover.

On October 16, 1997, Stover appealed the Division's determination as to all drivers except Quinn, and a hearing was held before an Appeals Referee on May 28, 1998. The Appeals Referee issued a decision affirming the Division's determination on June 23, 1998. On June 26, 1998, Stover filed an Application for Review with the Missouri Labor and Industrial Relations Commission (Commission). The Commission issued its order affirming and adopting as its own the findings and decision of the Appeals Referee pursuant to § 288.200.1 on December 9, 1998. This appeal followed.

■ In its sole point of error on appeal, Stover argues that the Commission erred in finding that its route drivers were employees, rather than independent contractors, because it relinquished the right to exercise control over the manner and means by which the drivers did their work.

■ This case is governed by Chapter 288, the Missouri Employment Security Law. § 288.210.[3] In *Travelers Equities Sales, Inc. v. Div. Of Employment Sec.*, 927 S.W.2d 912 (Mo.App. W.D.1996), we held that the standard of review set forth in *Davis v. Research Med. Ctr.*, 903 S.W.2d 557 (Mo.App. W.D.1995) was applicable to employment security decisions as well as

worker's compensation decisions. *Travelers Equities Sales, Inc. v. Div. Of Employment Sec.* 927 S.W.2d at 917. In *Davis,* this court stated:

> The reviewing court may not substitute its judgment on the evidence for that of the Commission. The weight of the evidence and the credibility of witnesses are ultimately for the Commission. The court applies a two-step process designed to determine whether the Commission could have reasonably made its findings and award upon consideration of all the evidence before it. In the first step, the court examines the whole record, viewing the evidence and all reasonable inferences drawn therefrom in the light most favorable to the award, to determine if the record contains sufficient competent and substantial evidence to support the award. If not, the Commission's award must be reversed. If there is competent and substantial evidence supporting the award, the court moves to the second step, where it views the evidence in the light most favorable to the award, but must consider all evidence in the record, including that which opposes or is unfavorable to the award, take account of the overall effect of all of the evidence, and determine whether the award is against the overwhelming weight of the evidence.

*Davis,* 903 S.W.2d at 571. *Davis* also teaches that:

> Findings and awards of the Commission which are clearly the interpretation or application of the law, as distinguished from a determination of facts, are not binding on the court and fall within the court's province of independent review and correction where erroneous. And, where the findings of ultimate fact are reached not by a process of natural reasoning from the facts alone, but rather by application of law, it is a conclusion of law and subject to reversal by the court.

3. RSMo. Cum.Supp.1998.

*Id.* Thus, when the facts are undisputed, albeit their significance can be viewed in different ways, the case involves primarily the application of the law to the facts, and we give no deference to the Commission. *Travelers Equities Sales, Inc.,* 927 S.W.2d at 917. Rather, our review is *de novo. Davis,* 903 S.W.2d at 560. In the instant appeal, there is essentially no controversy regarding the facts, and accordingly we review the Commission's application of the law to those facts *de novo.*

Chapter 288 generally provides that Missouri employers must make unemployment tax contributions for their employees. Section 288.034.1 defines the term "employment" as follows:

"Employment" means service, including service in interstate commerce, performed for wages or under any contract of hire, written or oral, express or implied, and notwithstanding any other provisions of this section, service with respect to which a tax is required to be paid under any federal unemployment tax law imposing a tax against which credit may be taken for contributions required to be paid into a state unemployment fund or which, as a condition for full tax credit against the tax imposed by the Federal Unemployment Tax Act, is required to be covered under this law.

Under Missouri case law, an employer has been found to have a financial incentive for establishing the independent contractor relationship, and therefore the arrangement is subject to scrutiny and the labels assigned by the parties are not controlling. *St. Charles County v. Hunter,* 950 S.W.2d 593, 594 (Mo.App. E.D.1997). Section 288.034.5 sets forth a test for determining whether an individual is an employee or an independent contractor:

Service performed by an individual for remuneration shall be deemed to be employment subject to this law unless it is shown to the satisfaction of the division that such services were performed by an independent contractor. In determining the existence of the independent contractor relationship, the common law of agency right to control shall be applied. The common law of agency right to control test shall include but not be limited to: If the alleged employer retains the right to control the manner and means by which the results are to be accomplished, the individual who performs the service is an employee. If only the results are controlled, the individual performing the service is an independent contractor.

At the hearing on May 28, 1998, Matt and Brenda Stover testified regarding the company's relationship with its drivers.[4] Matt Stover testified that some drivers were employees, while others were independent contractors. The primary differences were that employees drove company cars and their expenses were paid by Stover, whereas contractors furnished their own vehicles, and paid their own insurance and fuel expenses. He stated that contractors were free to work for other companies while working for Stover, although the record is silent on whether employees had the same option. Stover produced documents which it required drivers to complete prior to employment. All forms acknowledging required blood tests and training in blood handling and biological spill procedures state that they are to be placed in the individual's "personnel file." The company's drivers, whether called independent contractors or employees, were required to sign a non-compete contract,[5]

---

4. We do note, however, that due to the relaxed procedural standards of a Commission hearing, the majority of the "testimony" attributed herein to the Stovers was provided by their counsel.

5. A copy of the contract is in the record, entitled "Confidentiality Agreement With Em-

ployee." It identifies the driver as "Employee" and certifies, *inter alia,* "WHEREAS, Employee is employed by Corporation...." The form has spaces to be signed by both the "employee" and a representative of Stover. It states: "For one year after termination of employment with Stover Delivery Systems the

and to sign for receipt of a courier manual, which stated it was from Stover Delivery Systems, Inc., but, according to Stover, was actually compiled and required by Smith Kline, a customer. Although no system was in place to monitor the performance of the drivers, if a client complained that standards were not being followed, Stover would take action to discipline the individual. Matt testified that Stover did not control the times within which the contract drivers performed their routes.[6] However, timeliness of pickup and delivery was essential.[7] If a driver did not adhere to the standards in the manual, or missed a scheduled delivery, Matt Stover testified that it was Stover Delivery Systems that disciplined the individual.

All drivers, including independent contractor drivers, are required to complete a Stover Delivery Systems Route Cover Sheet daily, which details odometer start and finish readings, miles per day, amount paid for gas, number of stops, number of various types of specimens, start time, finish time, time off for breaks, total hours, and included check-off requirements for: check oil, check tires, first aid kit, fire extinguisher. The checklist has lines for "supervisor's approval—disapproval." Although it is not clear from the record, it appears that the various districts Stover serves are managed by supervisors. Most documents pertaining to delivery drivers reference "your supervisor."

In the company's welcome packet, under "Definition of Employment Status," it states:

> The following terminology will be used to describe the classification of employees and their employment status:

FULL TIME: Employees scheduled to work 40 hours or more per week and whose employment is for no definite term.

PART TIME: Employees scheduled to work less than 40 hours per week and whose employment is for no definite term.

EVALUATION PERIOD: New employees who have worked less than 90 days.

REGULAR: Employees who have completed 90 days service.

No other classification is listed. Under "Company Vehicles," the packet refers to "employees who operate company vehicles." Under "Personal Vehicles," the instructions pertain to "[e]mployees driving their own vehicle on a regular basis," and "[p]assengers in personal vehicles of employees while on delivery routes." The record also includes an "Independent Contractor Agreement" in blank. The "Independent Contractor" signature form has a signature line for "Employee."

None of the documents produced were signed by any of the drivers in question, with the exception of a non-compete contract signed by Debra Quinn. When asked why none of the forms were signed, Stover stated, "It was drawn up by a lawyer and they didn't want to sign it, so they didn't." Mr. Berry (counsel for Stover): "So they're not bound to those then, other than to the extent you had the right to terminate them at anytime that you wanted?" A: "Exactly."

Brenda Stover, the corporate secretary, testified that some of Stover's drivers in other states haul freight for companies

---

non-compete agreement prohibits you from establishing or working for a competing business within a 250 mile radius of St. Louis, MO. Employees who have questions concerning the non-compete contract should ask their supervisor for clarification."

6. The record is silent on whether employee drivers have any additional time restraints beyond those placed on contract drivers.

7. Contrary to this testimony, the investigation by Robert Duemler, field auditor for Division, revealed that driver Debra Quinn was terminated by Stover due to a timeliness issue. A copy of the "Stover Delivery Systems Inc. Termination Notice" in the record recites that Quinn was terminated on 6/29/96 for repeated incidents of tardiness wherein she was more than one hour late in reporting for work.

other than Stover while also maintaining a Stover route. She stated that some of the out-of-state drivers subcontract the Stover route to other individuals, and train those individuals themselves. The Stovers testified that the independent contractors negotiate a price for their route with Stover, and compensation could vary among drivers depending upon the negotiations.

Both James Smith and James Haage testified regarding their duties while driving for Stover. James Haage testified that at the time he became a driver for Stover, he had been presented with a written flat rate per route, with no indication that it was negotiable. The Stovers speculated that Haage had not known that he had the option to negotiate off the written rate, or had not wanted to negotiate a different rate.[8] Haage testified that there was no written agreement between himself and Stover. He worked 40 to 48 hours per week, and was paid by the route on a weekly basis by Stover, a set rate per route that he drove. His paycheck was issued by Stover, but passed on to the last stop on his route where he would pick it up. On a few occasions when it had not been delivered on time, he picked it up at Stover. His routine was that he contacted the Stover dispatcher each evening about 6 p.m. He was given a list of stops for the route. Haage testified that all direction for pickups and dropoffs came from Stover. He carried a beeper, furnished by Stover, which was used by the dispatcher to contact him for additional pickups which were called in by customers during his working hours. Notification of any route changes came from the Stover dispatcher, except on Sundays, when the Stover dispatcher was off at 2:00 p.m., then the customers could reach Haage by way of his pager, which he testified occurred only rarely. When necessary, Haage said he could get someone else to run his route for him. Stover furnished drivers with a hazardous material spill kit, and drivers were required to furnish fire extinguishers and first aid kits. Haage furnished his own vehicle and insurance and bought his own fuel. Stover furnished his uniform.

Haage testified that Stover contacted him about his route pay about three months prior to terminating him. Brenda Stover asked if he would accept a pay cut on his route. He refused, and approximately one month later, he received a call from the Stover dispatcher informing him that he was being terminated effective that day. Stover required that a driver give two weeks' notice prior to quitting a route. However, Haage testified that he was notified at 2:00 p.m. that he was no longer needed, that day's route would be his last, and that Stover would be combining routes, or that they had someone who would drive the route for less pay.

James Smith began work as a driver for Matt Stover, prior to incorporation of Stover Delivery Systems, and worked from 1993 to 1994 on an hourly basis. In 1995, Smith became a leased employee of TTC, but on an hourly basis. Later in 1995, Smith became a salaried employee. In March, 1996, Smith transferred from employee status to "independent contractor" status at the suggestion of Brenda Stover, who told him he could make more money that way. No documentation accompanied this relationship change. Smith stated that this change meant that he was "paid by the route," and that the only difference from his previous arrangement was that he was responsible for his own vehicle and expenses. After expenses, Smith's pay was about the same as it had been in the past. Smith testified that it would have been impossible to do delivery work for another company in addition to his work for Stover, because the Stover route was a full time job. Some disbursements from Stover to Smith were documented, while some apparently were in cash. In January, 1997, Stover informed Smith that he would again be paid on an hourly basis, at

---

**8.** Deumler testified that the issue of route pay being subject to negotiation was never raised by either drivers or by representatives of Stover during his investigation.

$10 per hour. When he responded that the arrangement was not satisfactory since he was required to pay his own expenses, and in the alternative, requested a part-time arrangement, Stover did not agree. At that point, the relationship between Smith and Stover terminated, and Smith filed a claim for unemployment compensation.

The director of the Division has statutory authority to promulgate regulations to efficiently and properly administer the law. *§ 288.220.5.* Pursuant to such authority, the director promulgated 8 C.S.R. 10–4150(1) to properly administer § 288.034.5, which provides in pertinent part:

[T]he division shall apply the common law rules applicable in determining the employer-employee relationship under 26 U.S.C., Section 3306(i). In applying the provisions of 26 U.S.C., Section 3306(i) the division shall consider the case law, Internal Revenue Service regulations and Internal Revenue Service letter rulings interpreting and applying that subsection.

"Section 3306(I) of Chapter 26 of the United States code defines 'employee' generally as an individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of employee." *Travelers Equities Sales, Inc.,* 927 S.W.2d at 920. The Internal Revenue Service has identified twenty factors to be considered and weighed in determining whether an individual or group of individuals should be classified as employees or independent contractors. *Id.* at 921; *Rev. Ruling 87–41.* The factors are not capable of mechanical application and are not given equal weight. *Edward Lowe Industries Inc. v. Missouri Div. Of Employment Security,* 865 S.W.2d 855, 863 (Mo.App. S.D. 1993). Analysis and application of the twenty factors as applied in this case follows:

(1) *Instructions.* A worker who is required to comply with other persons' instructions about when, where, and how he or she is to work is ordinarily an employee. This control factor is present if the person or persons for whom the services are performed have the RIGHT to require compliance with instructions.

Instructions are given to all drivers by way of the Stover Delivery Systems handbook. Regardless of its claimed source, the handbook purports to outline "Stover's policies and procedures." Drivers were disciplined if they did not follow procedures outlined in the handbook. Furthermore, the drivers received daily instruction from Stover's dispatcher as to when and where deviations from their route needed to be made, and drivers carried a beeper whereby the dispatcher could contact them. Stover clearly retained the right to require drivers' compliance with its instructions, and this factor weighs in favor of the Division.

(2) *Training.* Training a worker by requiring an experienced employee to work with the worker, by corresponding with the worker, by requiring the worker to attend meetings, or by using other methods, indicates that the person or persons for whom the services are performed want the services performed in a particular method or manner.

According to both the drivers and Stover's representatives, training was conducted by experienced drivers riding the route with the new driver for a varying number of days. Smith also testified that driver training included use of the biological spill kit and first aid. This factor weighs in favor of the Division.

(3) *Integration.* Integration of the worker's services into the business operations generally shows that the worker is subject to direction and control. When the success or continuation of a business depends to an appreciable degree upon the performance of certain services, the workers who perform those services must necessarily be subject to a certain amount of control by the owner of the business.

The integration factor weighs heavily in favor of the Division. Stover's continuation and success depended almost entirely upon the drivers' performance of their duties. The drivers' pickups and deliveries were the only service provided by the company. Indeed, the company handbook states: "It is imperative for the survival and future of our company that we provide our clients with outstanding customer service . . ."

(4) *Services Rendered Personally.* If the services must be rendered personally, presumably the person or persons for whom the services are performed are interested in the methods used to accomplish the work as well as in the results.

This factor is somewhat neutral. While all parties testified that it was acceptable company policy to have another individual who was not necessarily a Stover driver act as a substitute on a route in an emergency, it does not appear that such an arrangement ever occurred. Both drivers testified that when they needed a substitute, another company driver took over their routes for them. Furthermore, it is not clear how training or procedures were to be handled between Stover and the prospective "sub-contractors."

(5) *Hiring, Supervising, and Paying Assistants.* If the person or persons for whom the services are performed hire, supervise, and pay assistants, that factor generally shows control over the workers on the job. However, if one worker hires, supervises, and pays the other assistants pursuant to a contract under which the worker agrees to provide materials and labor and under which the worker is responsible only for the attainment of a result, this factor indicates an independent contractor status.

Although the Stovers testified through their attorney that their drivers were free to hire subcontractors to drive their routes for them when they were unable, there is no evidence in the record of subcontractor agreements or provisions for subcontractor supervision or payment. Neither of the two drivers who testified ever subcontracted an assistant. However, given evidence that they were not precluded from doing so, this factor weighs in favor of Stover.

(6) *Continuing Relationship.* A continuing relationship between the worker and the person or persons for whom the services are performed indicates that an employer-employee relationship exists. A continuing relationship may exist where work is performed at frequently recurring although irregular intervals.

Drivers maintained an ongoing relationship with Stover since they drove routes daily over the course of several years, and presumably could have done so indefinitely. The Independent Contractor Agreement states that it is for the period of one year, and that it automatically renews for another one year term. This factor weighs in favor of the Division.

(7) *Set Hours of Work.* The establishment of set hours of work by the person or persons for whom the services are performed is a factor indicating control.

Although the Stovers testified that there were no "set" work hours wherein drivers were required to report to work, the evidence suggests that the company did require that its drivers maintain their routes within specific parameters. Debra Quinn was terminated after reporting for work more than one hour late on several occasions. Dropoff and pickup times were scheduled along each driver's route. All stops needed to be completed before the driver could conclude his route. These facts suggest that Stover retained considerable control over its drivers' schedule, and weigh this factor in favor of the Division.

(8) *Full Time Required.* If the worker must devote substantially full time to the business of the person or persons for whom the services are performed, such person or persons have control over the amount of time the worker spends working and impliedly restrict the worker

from doing other gainful work. An independent contractor on the other hand, is free to work when and for whom he or she chooses.

The Stovers testified that their drivers were free to work as many hours as their routes required. James Smith testified that his route required approximately 12 hours per day, six day a week. James Haage stated that he drove his route 40–48 hours per week. As the drivers' schedules confirm that their jobs with Stover necessitated substantially full-time commitments, it is apparent that Stover impliedly restricted their ability to drive for other companies, or engage in other gainful work.

(9) *Doing Work On Employer's Premises.* If the work is performed on the premises of the person or persons for whom the services are performed, that factor suggests control over the worker, especially if the work could be done elsewhere ... The importance of this factor depends on the nature of the service involved and the extent to which an employer generally would require that employees perform such services on the employer's premises. Control over the place of work is indicated when the person or persons for whom the services are performed have the right to compel the worker to travel a designated route, to canvass a territory within a certain time, or to work at specific places as required.

Given the nature of the delivery business, it is virtually impossible for a driver to fulfill the requirements of the job on the Stover premises. Stover assigned drivers to its various routes. The drivers testified that they began their day at the Stover offices, by checking in with the company dispatcher. The dispatcher gave each driver his/her schedule of stops for the day, the order of those stops, and contacted the driver if any additions or changes occurred during the day. All stops needed to be completed each day. Such procedures constitute a right to compel the

workers to travel a designated route and to cover the territory or route within a prescribed time. This factor weighs in favor of the Division.

(10) *Order or Sequence Set.* If a worker must perform services in the order or sequence set by the person or persons for whom the services are performed, that factor shows that the worker is not free to follow the worker's own pattern of work but must follow the established routines and schedules of the person or persons for whom the services are performed. Often, because of the nature of an occupation, the person or persons for whom the services are performed do not set the order of the services or set the order infrequently. It is sufficient to show control, however, if such person or persons retain the right to do so.

Both Smith and Haage testified that their routes were prescribed by Stover. They could deviate from the order of the stops if they felt they could do so more efficiently and as long as all stops were completed each day. Stover testified that it did not control its drivers' schedules. However, since dispatchers could add stops during the day and contact drivers for changes in the route, Stover clearly retained the right to control the route. This factor weighs in favor of the Division.

(11) *Oral or Written Reports.* A requirement that the worker submit regular or written reports to the person or persons for whom the services are performed indicates a degree of control.

In this case, all drivers were required to complete both an invoice (with a line indicating "supervisor approval" of expenses and "wait pay,") and a "Route Cover Sheet" (with a line for signature by "group leader") for each route, both of which indicate supervisor control of the driver's activities. This factor weighs in favor of the Division.

(12) *Payment by Hour, Week, Month.* Payment by the hour, week, or month generally points to an employer-employ-

ee relationship, provided that this method of payment is not just a convenient way of paying a lump sum agreed upon as the cost of a job. Payment made by the job or on a straight commission generally indicates that the worker is an independent contractor.

Both Smith and Haage indicated that they had been paid by the hour and by the route at various times on the job. The Stovers indicated that they paid drivers by the route. A copy of Stover's Payroll Calendar indicates a two-week pay cycle. While it is not clear how the majority of the disputed drivers were consistently paid, none were paid in one lump sum for their services. This factor is undetermined.

(13) *Payment of Business and/or Traveling Expenses.* If the person or persons for whom the services are performed ordinarily pay the worker's business and/or traveling expenses, the worker is ordinarily an employee. An employer, to be able to control expenses, generally retains the right to regulate and direct the worker's business activities.

It is Stover's position that it did not pay the expenses of its independent contractors, only those of employee drivers. Expenses primarily consisted of fuel for company cars. However, Haage indicated that he was sometimes paid for "off route" deliveries, and Smith was occasionally paid cash payments. It would appear these payments were for expenses over and above those normally incurred on the driver's route. This factor weighs in favor of Stover.

(14) *Furnishing of Tools and Materials.* The fact that the person or persons for whom the services are performed furnish significant tools, materials, and other equipment tends to show the existence of an employer-employee relationship.

While Stover supplied company cars for some drivers, other drivers were required to furnish their own vehicles and fire extinguishers. The company did, however, supply drivers with biological spill kits, and with company uniforms, which they were required to wear. This factor is neutral.

(15) *Significant Investment.* If the worker invests in facilities that are used by the worker in performing services and are not typically maintained by employees (such as the maintenance of an office rented at fair value from an unrelated party), that factor tends to indicate that the worker is an independent contractor. On the other hand, lack of investment in facilities indicates dependence on the person or persons for whom the services are performed for such facilities and, accordingly, the existence of an employer-employee relationship...Special scrutiny is required with respect to certain types of facilities, such as home offices.

In this case, none of the subject drivers made any investment in any facilities for purposes of performing their jobs. This factor rests with the Division.

(16) *Realization of Profit or Loss.* A worker who can realize a profit or suffer a loss as a result of the worker's services (in addition to the profit or loss ordinarily realized by employees) is generally an independent contractor, but the worker who cannot is an employee...For example, if the worker is subject to a real risk of economic loss due to significant investments or a bona fide liability for expenses, such as salary payments to unrelated employees, that factor indicates that the worker is an independent contractor. The risk that a worker will not receive payment for his or her services, however, is common to both independent contractors and employees and thus does not constitute a sufficient economic risk to support treatment as an independent contractor.

It was the Stovers' position in representations to some of their drivers that the driver could make a higher income as an independent contractor than as an employ-

ee driver. The evidence is unclear as to how the driver would realize such a gain since, as an independent contractor, the driver was responsible for providing his own vehicle as well as paying for insurance and his own fuel expenses. The only possibility for an increase in income would be the driver's rate of pay. It is undisputed that some drivers were paid more than others for the same service, based on negotiations with Stover, although both Smith and Haage indicated they were not aware that the route pay was negotiable, and Duemler's investigation did not reveal any evidence of negotiability of the route pay. The risk of loss for an independent contractor lay in the driver's liability for any loss due to accidents, although Stover required that the driver carry insurance on the vehicle. Ultimately, Smith and Haage either left Stover's employ or were terminated because they would not accept Stover's attempt to reduce their income. This factor weighs in favor of the Division.

(17) *Working For More Than One Firm At a Time.* If a worker performs more than de minimis services for a multiple of unrelated persons or firms at the same time, that factor generally indicates that the worker is an independent contractor...However, a worker who performs services for more than one person may be an employee of each of the persons, especially where such persons are part of the same service arrangement.

No evidence was presented to indicate that any of the drivers in question worked for any other persons or firms while acting as a delivery driver for Stover. Although Brenda Stover testified that several out-of-state drivers do so, there was no corroborating evidence of the fact. Given the time requirements, it is unlikely that a driver would find it possible to run a delivery route for another employer in addition to Stover. This factor weighs in favor of the Division.

(18) *Making Service Available to General Public.* The fact that a worker makes his or her services available to the general public on a regular and consistent basis indicates an independent contractor relationship.

Although the Stovers testified that their drivers were free to make their services available to the general public, nothing in the record indicates that any of the subject drivers did so at any time. Neither Smith nor Haage drove for any other company while driving for Stover, nor could they reasonably have done so based on the number hours required to perform their services for Stover. This factor weighs in favor of the Division.

(19) *Right to Discharge.* The right to discharge a worker is a factor indicating that the worker is an employee and the person possessing the right is an employer. An employer exercises control through the threat of dismissal, which causes the worker to obey the employer's instructions. An independent contractor, on the other hand, cannot be fired so long as the independent contractor produces a result that meets the contract specifications.

Both testimony at the hearing and Stover's Independent Contractor Agreement indicate that Stover could terminate its drivers at will, regardless of their employment status. Matt Stover testified that Stover could terminate its drivers at any time. Indeed, Haage was notified at 2:00 p.m. that he was terminated effective at the end of that day's route. This factor weighs in favor of the Division.

(20) *Right to Terminate.* If the worker has the right to end his or her relationship with the person for whom the services are performed at any time he or she wishes without incurring liability, that factor indicates an employer-employee relationship.

The company handbook provides that drivers are required to give two weeks' notice at resignation, and to complete an exit interview. This suggests the drivers were free to quit at any time without

incurring liability. Indeed, Smith quit when Stover demanded he take a pay cut, and he incurred no liability. This factor weighs in favor of the Division.

Fourteen factors support the Division's position that the drivers are employees. Three factors are neutral or undetermined, and two favor Stover's position that the drivers are independent contractors. Nevertheless, it must be remembered that no single factor is controlling. *Edward Lowe Ind., Inc. v. Div. of Emp. Sec.*, 865 S.W.2d 855, 863 (Mo. App. S.D.1993). Likewise, a decision cannot be based on a mere numerical tally of the factors, because some are more important than others. *Travelers Equities Sales, Inc.*, 927 S.W.2d at 925. Ultimately, the bedrock principle is the common law agency test of the right to control the manner and means of performance. *Id.*

Stover relies almost exclusively on our decision in *Kirksville Pub. Co. v. Division of Employment Sec.*, 950 S.W.2d 891 (Mo. App. W.D.1997). In that case, the Division contended that motor carriers who delivered *The Carthage Press,* a newspaper owned and published by Kirksville Publishing Co., were employees rather than independent contractors. The Labor and Industrial Relations Commission affirmed the holding of the appeals tribunal that the motor carriers were employees and Kirksville Publishing appealed. We reversed the Commission's decision, finding that the carriers were in fact independent contractors. *Id.* at 900.

Stover contends that the facts in this case are almost identical to those in *Kirksville Publishing Co.* Contrary to Stover's assertions, however, the facts in the latter case are significantly different from those in the instant appeal. In that case, some of the relevant facts were: (1) there was a written contract between each of the carriers and the appellant which provided, among other things, that either side could terminate the agreement upon 30 days' written notice; (2) the appellant supplied no equipment, supplies or uniforms to be used by the carriers; (3) the carriers collected the subscription price from the subscribers and their compensation was the difference between that amount and what appellant charged the carriers for the newspapers delivered; (4) the carriers had no required forms to complete (except a new subscription form to be used for new customers as needed); (5) the carriers were not required to work full time, nor were they impliedly restricted from other gainful work because they only worked 2½ to 4½ hours per day; (6) the appellant had other means of delivering its newspapers other than motor carriers and in fact fifty to sixty percent of its newspapers were distributed by mail, vendors and junior carriers; and (7) the carriers delivered to everyone on a customer list without daily instruction or supervision, and the timeliness of their deliveries to particular customers was not important so long as the route was completed by about 5:00 p.m.

In the instant appeal, these relevant facts are either missing or just the opposite of the circumstances in *Kirksville Publishing Co.* While Stover had a form of written agreement, it was seldom if ever used. Unlike the mutual termination provision in the publishing company's contract, requiring either party to give 30 days' notice, Stover could terminate drivers at any time without notice. Moreover, Stover did have an employee handbook setting out policies and procedures to be followed by drivers. Second, Stover supplied all drivers with biological spill kits, as well as uniforms with the company's name on them which their drivers were required to wear. Kirksville Publishing supplied nothing other than the newspapers to be delivered. Third, Stover's drivers were paid on a regular basis by Stover. They did not collect money, pay a portion to Stover and retain the rest. Moreover, Stover's drivers could not enhance their income by soliciting potential customers for pickups and deliveries, while the newspaper's delivery people were encouraged to sign up more subscribers and thereby

increase their income. Fourth, unlike the newspaper deliverers, who had no forms to complete, Stover required its drivers to complete invoicing forms as well as daily "Route Cover Sheets" which detailed odometer start and finish readings, miles per day, amount paid for gas, number of stops, number of various types of specimens, start time, finish time, time off for breaks, total hours and a variety of other items. Fifth, unlike the newspaper's delivery people, who worked between 2½ and 4½ hours per day, Stover's drivers were working more than eight hours per day and realistically could not have worked for anyone else or engaged in other gainful work. Sixth, Stover's drivers were absolutely essential to the survival of the company as they provided its only service, unlike the newspaper, which had alternative means of delivering its papers. Finally, Stover controlled its drivers' daily routes with dispatches. The timeliness of its pickups and deliveries was also essential, and it retained the ability to change a driver's route by adding new dispatches or changes during the day. In *Kirksville Publishing Co.*, there was no control or supervision of the daily route or time of delivery.

Thus, we find Stover's reliance on *Kirksville Publishing Co.* misplaced. Rather, we find the relevant case law to support our conclusion. This court has previously held, under the prior version of § 288.034.5, that even in situations where representatives performed their job duties without significant control from the company, they did not qualify as independent contractors when the representatives had no independent established business of their own separate and apart from the company itself. *American Yearbook Co., Inc. v. Labor and Industrial Relations Comm'n,* 739 S.W.2d 755, 758 (Mo.App. W.D.1987). In that case, representatives could vary the time and manner of performance of their sales duties, but were required to sell only the company's products, and signed a non-compete agreement identical to that required by Stover. *Id.* at 756. "The double requirement, that the

worker's occupation be 'independently established' and that he be 'customarily' engaged in it, clearly calls for an enterprise created and existing separate and apart from the relationship with the particular employer, an enterprise that will survive the termination of that relationship." *Id.* at 757 (*quoting* Wilcox, The Coverage of Unemployment Compensation Laws, 8 Vand. L.Rev. 245, 265 (1955) (commenting on statutory wording identical to that in § 288.034(5)). In this case, the claimed "independent contractors" took on that status at the encouragement of Stover, were unable, given the time requirements, to work for any other companies at the same time, and neither Smith nor Haage owned enterprises of their own in the delivery business.

> [T]he control test tends to exclude from coverage many persons who, fully as much as common-law servants, are dependent on their jobs for their daily living and are exposed to the risk of unemployment. Many a commission salesman, for example, works full time for a single concern and derives his whole income from that source, and if the relationship is severed, finds himself in the same plight as any other worker who has been discharged. He may (or may not) have enjoyed such freedom from detailed control of his activities as to persuade a court that he was an independent contractor at common law, but if he did, his freedom was not the kind of independence which commonly rids the true entrepreneur of the risk of unemployment.

*American Yearbook Co.,* 739 S.W.2d at 757–58 (*quoting* Wilcox). Thus, the court in *American Yearbook* recognized, as do the current 20 factors, that it is not how detailed the control is, but rather the overall control imposed.

Also on the issue of a right to control, the Southern District has held that the cancellation provision of a truck driver's contract was controlling in light of IRS

provisions 19 and 20. In *Merick Trucking, Inc. v. Missouri Div. Of Employment Security, Labor and Ind. Relations Comm'n of Missouri,* 902 S.W.2d 871 (Mo. App. S.D.1995), a "Lease Agreement" between truck drivers and the trucking company classified drivers as "independent contractors," and stated that the employment arrangement could be cancelled by either party at any time without liability, identical to the Stover written agreement (unsigned) and testimony by all parties in this case. The *Merick* court held that where the driver knew his employment would end if he did not follow the company's instructions, this right to terminate equated to a right to control. *Id.* at 875. The truck driver was therefore found to be an "employee." *Id.*

In the case of Stover's delivery drivers, Debra Quinn was terminated for arriving more than one hour late for work on several occasions. The company handbook outlined required procedures for pickups and deliveries, as well as customer relations and biological spill handling. Matt Stover testified that the company would discipline drivers if customers reported dissatisfaction with their handling of the route. Both drivers testified that they were aware that Stover required certain procedures, and that they could quit or be terminated without liability. The Stover arrangement is identical to that in *Merick,* and therefore the right to terminate for failure to follow procedures constitutes a right to control.

In *Traverlers Equities Sales* and *Kirksville Publishing Co.,* we recognized that the right to control is the critical factor in any analysis of an employee versus independent contractor status. In each of those cases, it was considered determinative. *Kirksville Publishing Co.,* 950 S.W.2d at 900; *Travelers Equities Sales, Inc.,* 927 S.W.2d at 925. It is also dispositive here. Based on our review of the twenty factors and the relevant case law, we can only conclude that Stover exercised overall control of the manner and means of

performance, and that the drivers in question were in fact employees.

For the foregoing reasons, the award of the Labor and Industrial Relations Commission is affirmed.

All concur.