Frank ASARO, Appellant,

v.

DIVISION OF EMPLOYMENT SECURITY, STATE OF MISSOURI, Respondent.

No. WD 58283.

Missouri Court of Appeals,
Western District.

Nov. 7, 2000.

**624**

Patrick Cuezze, Kansas City, for appellant.

Sharon Ann Willis, Kansas City, for respondent.

Before Presiding Judge
LOWENSTEIN, Judge LAURA
DENVIR STITH and Judge NEWTON.

LAURA DENVIR STITH, Judge.

Frank Asaro appeals from the decision of the Labor and Industrial Relations Commission upholding an assessment against him by the Division of Employment Security for the post-dissolution debts of Midwest Seafood Packing Company ("Midwest"). The Commission based its decision on a determination that Mr. Asaro was the President of Midwest and had carried on the business of Midwest after its dissolution, thus making him liable for its post-dissolution debts pursuant to Section 351.486.3 RSMo 1994. Mr. Asaro argues that the Division failed to present competent and substantial evidence that he was President of Midwest, and that, taken as a whole, the evidence that he was *not* the President of Midwest greatly outweighed the evidence that he served in that capacity. Alternatively, he argues that there was insufficient evidence to conclude that he carried on the business of Midwest past its date of dissolution.

We find that the decision of the Commission was supported by competent and substantial evidence that Mr. Asaro was President of Midwest, and that the Commission's decision that he was President was not against the overwhelming weight of the evidence. We further find that the evidence supported the Commission's determination that he carried on the business of Midwest after its administrative dissolution. Accordingly, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The facts shown in the record are as follows:

Appellant Frank Asaro marketed and sold seafood products bearing the label "Carnival Brand Seafood," from 1996 until late 1997. He was an officer of Carnival Brand Seafood Company, Inc. ("Carnival"), during that period. Carnival produced the bulk of the seafood marketed by Mr. Asaro in Honduras, and Mr. Asaro sold it throughout the United States to various grocery store chains.

One item marketed by Mr. Asaro under Carnival's label was a bacon-wrapped barbecue shrimp product. This product could not be manufactured in Honduras, however, due to United States Department of Agriculture regulations which placed pork produced in Honduras under quarantine and prohibited its importation into the United States. In order to produce and market bacon-wrapped shrimp domestically without violating USDA regulations, Carnival created Midwest Seafood Packing Company. Midwest was duly incorporated under the laws of the State of Delaware. Midwest filed an application for a Certificate of Authority to do business in Missouri in 1996 in which it listed Julia Rukin as President of Midwest, and it received a Certificate of Authority from the Missouri Secretary of State's office to transact business in Missouri on November 14, 1996. Midwest began operating as a small production facility at 2319 Troost, Kansas City, Missouri, manufacturing and packaging only the bacon-wrapped shrimp, using locally produced pork and shrimp imported from Honduras.

Although Ms. Rukin had been listed as President of Midwest in Midwest's application for a Certificate of Authority, when Midwest filed its 1996 Annual Registration Report with the Missouri Secretary of State's office on May 20, 1997, it listed Mr. Asaro as its President. That report bears a signature, the first letter of the first name of which appears to begin with F, and the first letter of the last name of which appears to begin with A in other words, the names in the signature begin with the initial letters of Mr. Asaro's first and last names. The rest of the signature is illegible, however. Mr. Asaro claims he did not prepare the 1996 Registration Report or list himself as President in it, but

he testified that he became aware that the Report listed him as President. He took no action to change or correct this listing.

■ After operating for approximately one and one-half years, Midwest was administratively dissolved by the Missouri Secretary of State on August 18, 1997, for failure to file a correct Annual Report. Under Missouri law, upon dissolution a corporation continues its existence, but is limited to activities appropriately calculated to wind up and liquidate its business—it generally may not carry on any new business. *Mesler v. Director of Revenue*, 983 S.W.2d 605, 608 (Mo.App. E.D.1999).

After Midwest was administratively dissolved, Mr. Asaro continued to sell the shrimp product manufactured by Midwest; several Midwest employees continued their work at the manufacturing plant through the end of 1997; and according to Midwest's "Quarterly Contribution and Wage Report," Midwest continued to pay its employees after the administrative dissolution. Based on these facts, the Division determined that Midwest had neglected or refused to make contribution reports for the fourth quarter of 1997, and had further failed to pay those contributions as required under Section 288.090 RSMo 1994.[1] On March 25, 1999, the Missouri Department of Labor and Industrial Relations, Division of Employment Security therefore issued an Assessment for Contributions, Interest and Penalties against Appellant Frank Asaro, d/b/a Midwest Seafood Packing Company.

The Division directed the Assessment against Mr. Asaro personally based on its express finding that he had "conducted business on behalf of the corporation [Midwest] in a manner other than as provided in section 351.476, RSMo 1994." Section

---

1. The relevant portion of the 1994 version of that statute provided:

Contributions shall accrue and become payable by each employer for each calendar year in which he is subject to this law. Such contributions shall become due and be paid by each employer to the division for

the fund on or before the last day of the month following each calendar quarterly period of three months ...

Sec. 288.090 RSMo 1994. The legislature made minor changes to subsection 288.090.1 in 1995 which are not relevant here.

351.476 limits a corporation's post-dissolution activities to "winding up" or liquidation of the business, and provides that "any . . . officer or director who conducts business on behalf of the corporation except as provided in this section shall be personally liable for any obligation so incurred." Sec. 351.476.2(3) RSMo 1994.[2] Based on this section, the Division found Mr. Asaro "personally liable for payment of all contributions, interest and penalty due for the periods of operation subsequent to August 18, 1997," the date of Midwest's administrative dissolution.

Mr. Asaro filed a Petition for Reassessment on April 6, 1999, challenging the Division's findings. Following a hearing, the appeals referee agreed with the Division that: (1) Mr. Asaro was President of Midwest Seafood Packing Company, and (2) Mr. Asaro carried on the business of Midwest after the corporation was administratively dissolved. Mr. Asaro filed a *pro se* Application for Review with the Labor and Industrial Relations Commission on December 9, 1999. Without additional proceedings, the Commission adopted the decision of the Appeals Tribunal on January 24, 2000. Mr. Asaro has appealed to this Court.

## II. STANDARD OF REVIEW

■ "The findings of the commission as to the facts, if supported by competent and substantial evidence and in the absence of fraud, shall be conclusive, and the jurisdiction of the appellate court shall be confined to questions of law." Sec. 288.210 RSMo Cum.Supp.1999. Under this standard, our review of the Commission's decision is limited. We do not substitute our judgment on factual matters for that of the Commission, but rather determine whether the Commission's findings are supported by

competent and substantial evidence by undertaking a two-step process:

In the first step, the court examines the whole record, viewing the evidence and all reasonable inferences drawn therefrom in the light most favorable to the [decisions], to determine if the record contains sufficient competent and substantial evidence to support the award. If not, the Commission's award must be reversed. If there is competent and substantial evidence supporting the award, the court moves to the second step, where it views the evidence in the light most favorable to the award, but must consider all evidence in the record, including that which opposes or is unfavorable to the award, take account of the overall effect of the evidence, and determine whether the award is against the overwhelming weight of the evidence.

*Forms World, Inc. v. Labor and Indus. Relations Comm'n,* 935 S.W.2d 680, 684 (Mo.App. W.D.1996), *citing, Davis v. Research Medical Center,* 903 S.W.2d 557, 571 (Mo.App. W.D.1995).

## III. THE COMMISSION'S DECISION IS SUPPORTED BY THE RECORD

■ Mr. Asaro argues that the evidence was insufficient to demonstrate that he was the President of Midwest, and that, taken as a whole, the evidence that he was *not* the President of Midwest greatly outweighed the evidence that he served in that capacity. Alternatively, he argues that there was insufficient evidence to support the Commission's determination that he carried on the business of Midwest past its date of dissolution, a necessary prerequisite to his liability under Section 351.486.3.

Here, upon a review of the entire record, we conclude that there was sufficient

**2.** We note that Section 351.486 RSMo 1994 similarly states:

A corporation administratively dissolved continues its corporate existence but may not carry on any business except that necessary to wind up and liquidate its business

and affairs . . . and any officer or director who conducts business on behalf of a corporation so dissolved . . . shall be personally liable for any obligation so incurred.
Sec. 351.486.3 RSMo 1994.

evidence for the Commission to conclude that Mr. Asaro was the President of Midwest. As noted above, certified corporate records from the office of the Missouri Secretary of State, file-stamped May 20, 1997, and denominated as Midwest's 1996 Annual Registration Report, listed Mr. Asaro as the President of Midwest. Moreover, while the entire signature on the document is not legible, it is clear that the first and last names of the signature on the document start with the same letters that start Mr. Frank Asaro's first and last names—"F" and "A."

The evidence provided by the 1996 Annual Report clearly constitutes evidence which, if believed by the Commission, supported its determination that Mr. Asaro was, in fact, President of Midwest, as Midwest had represented him to be in official documents filed with the Missouri Secretary of State. This is particularly true where, as here, Mr. Asaro admitted that he had heard rumors that he would be listed as President in the report and he became aware that he was listed as President in the report yet did nothing to correct this alleged inaccuracy. It is true that Mr. Asaro denied that the signature on the registration report was his. Mr. Asaro testified that he had nothing to do with the filing of this report, that he was unaware that he had been appointed President of Midwest, that he never signed any papers authorizing his appointment as President, and that he had nothing to do with the day-to-day operations of Midwest as a manufacturing concern. The Commission was entitled to believe none, all, or part of Mr. Asaro's testimony, however. *Lauderdale v. Division of Employment Security,* 605 S.W.2d 174, 178 (Mo.App. E.D.1980). The Commission need not have lent any credence to Mr. Asaro's self-serving assertions that the signature was not his and that he did not authorize his designation as President of Midwest.

Mr. Asaro further claims that, even if the 1996 Annual Registration Report listing him as President constitutes competent and substantial evidence from which the Commission could have found that he was President of Midwest, that evidence was substantially outweighed by contrary evidence that he was not President of Midwest, that all of his dealings with Midwest were "at arms length," and that he was merely a marketing agent of Carnival, Inc. We disagree.

Countering Mr. Asaro's claims that he was merely an employee of Midwest was Mr. Asaro's own testimony that he was an officer of Carnival Brand Seafood, Inc., that both Carnival and Midwest were owned by the same investors, and that the IRS had "pierced the corporate veil" and considered Midwest and Carnival to be alter egos and one and the same company. In addition, Mr. Asaro testified to his extensive personal and high-level involvement with the operations of Midwest, including admitting that he conducted numerous on-site inspections of the product produced by the company and that the on-site manager of Midwest reported all product information to him. The manager considered Mr. Asaro to be a superior and "answered to" him. Carnival also sent money to Mr. Asaro to pay for the business debts incurred by Midwest, and to pay taxes levied on Midwest by Missouri. And, Mr. Asaro signed the paychecks for Midwest employees at the company's inception, and for some time thereafter. He ceased to do so only when he was told by the USDA that he could not sign the paychecks for Midwest because he had been convicted of a prior (unrelated) felony. Mr. Asaro also paid for Midwest's rental of its manufacturing facility with money sent from Carnival, Inc.

Thus, considering the evidence as a whole, there existed substantial and competent evidence to support the Commission's determination that Mr. Asaro was the President of Midwest, and we do not find that the decision of the Commission was contrary to the overwhelming weight

of the evidence. *See Forms World, Inc.,* 935 S.W.2d at 684.

■ We also find no merit to Mr. Asaro's challenge to the factual finding of the Commission that he personally "carried on" the business of Midwest beyond the date of its administrative dissolution. He claims that the evidence showed that he was not carrying on Midwest's business, in that the business of Midwest was manufacturing the bacon-wrapped barbecue shrimp product, and that he merely sold this product not on behalf of Midwest, but rather on behalf of Carnival Brand Seafood Company, Inc. Again, we disagree.

First, there was also evidence that Midwest employees, not just Carnival employees, continued to work and to be paid after the administrative dissolution, and the Commission implicitly found that their actions constituted more than merely winding up Midwest's affairs. Second, any attempt by Mr. Asaro to hide behind a distinction between the corporate forms of Carnival Brand Seafood and Midwest Seafood is necessarily defeated by his own testimony that the IRS had already successfully challenged the corporate integrity of Carnival and Midwest as separate entities. He testified that, upon his prior declaration of bankruptcy, the IRS had "pierced the corporate veil" between Carnival and Midwest, proving that the two companies, for all intents and purposes, were one and the same. There was evidence in the record to support the Commission's conclusion that he was an officer of both entities. The Commission could consider this evidence, provided by his own testimony, and the other evidence noted above, and conclude that Mr. Asaro personally continued to "carry on" the business of Midwest after it had been administratively dissolved. The Commission's findings in this regard are fully supported by the record.

For all of these reasons, we find that substantial and competent evidence supported the Commission's determination that Mr. Asaro was President of Midwest and that he carried on the business of Midwest after Midwest had been administratively dissolved. Accordingly, the judgment is affirmed.

Presiding Judge LOWENSTEIN and Judge NEWTON, concur.