**QUALITY MEDICAL TRANSCRIPTION, INC., Appellant,**

v.

**Dorothy WOODS, Defendant,**

**Division of Employment Security, Respondent.**

**Nos. WD 60584, WD 60719.**

Missouri Court of Appeals, Western District.

Dec. 17, 2002.

William J. Sanders, Esq., Kansas City, MO, for Appellant.

Ronald J. Miller, Esq., Jefferson City, MO, for Respondent.

Before ELLIS, C.J., HOLLIGER and HARDWICK, JJ.

LISA WHITE HARDWICK, Judge.

Quality Medical Transcription, Inc. (QMT) appeals the Labor and Industrial Relations Commission's (Commission) determination that QMT is liable for state unemployment benefits and taxes for its medical transcribers because they are employees and not independent contractors. We affirm.

## Factual and Procedural Background

QMT began business in 1987, providing medical records transcription services for physicians, clinics, and hospitals. A management staff of three employees currently work in its central office in Blue Springs. QMT has "Subcontractor Agreements" with approximately fifteen transcribers who work out of their homes performing all of the company's transcription services.

Prior to 1992, the transcribers worked in QMT's central office, where they used company equipment and were considered employees. As digital computer technology improved and transcribers desired more flexibility in their work schedules, QMT revised its operational procedures in 1992 to require transcribers to work from home using their own transcription equipment. QMT thereafter entered into Subcontractor Agreements with the transcribers and considered them independent contractors.

On July 18, 2000, Dorothy Woods signed a Subcontractor Agreement to provide transcription services for QMT. Woods continued working under the agreement until QMT "discharged" her on January 18, 2001.

On January 22, 2001, Woods filed a claim for unemployment benefits with the Division of Employment Security (Division). The Division issued a determination, on March 6, 2001, that Woods was

"employed by" QMT during the third quarter of the year 2000 and was entitled to receive unemployment benefits based on wages received from QMT during that quarter.

Concurrently, sometime in early 2001, the Division conducted a general investigation into QMT's practice of retaining transcribers on a subcontractor basis. The investigation resulted in the Division issuing a separate determination, on March 22, 2001, that all of the transcribers "performed services in employment" and were paid "wages" as defined by the Missouri Employment Security Law, §§ 288.034 and 288.036 RSMo.2000. The Division concluded the transcribers were not independent contractors but employees, for whom QMT owed unemployment taxes.

At QMT's request, the Division's Appeals Tribunal held joint hearings on Woods' unemployment claim and the tax liability determination. Woods testified at one of the appeals hearings. Two other transcribers, who similarly contracted with QMT, also testified. Other witnesses included the president/founder of QMT, an unemployment insurance auditor, and a Division employee responsible for reviewing documents related to the investigation of QMT's relationship with the transcribers.

Evidence at the appeals hearings indicated Woods previously worked as a licensed practical nurse and had no prior experience as a medical transcriber. To prepare for her transcriber job, Woods received training from QMT on computer word-processing and the operation of micro-cassette recording equipment. Once trained, Woods and the other transcribers worked out of their homes using their own computers, internet access, and word processing software. QMT provided Woods with a micro-cassette recorder. Some of the transcribers borrowed or rented specialized transcription equipment, such as headphones and foot pedals, from QMT.

QMT's office manager distributed transcription assignments on a daily basis to each transcriber. Each assignment included an instructional handout, prepared by QMT, to demonstrate the transcription format required by the client. QMT sent the daily transcription assignments to each transcriber via internet work files, or the transcriber could pick up the assignments at QMT's offices between 11:00 a.m. and 2:00 p.m. each workday. Per the industry standard, the transcriptions were to be completed and returned to QMT by 8:00 a.m. the following day with a "job sheet" documenting the work performed for a particular client. If the assignments could not be timely completed, transcribers called QMT to request an extension.

The transcribers also documented their completed assignments weekly on "work log" forms they received from QMT. The completed forms provided information QMT needed in order to bill clients and pay the transcribers. Transcribers were paid by the number of characters typed, at a rate generally set by QMT. Paychecks were issued to the transcribers each Friday and were drawn from QMT's business account. QMT did not withhold taxes or reimburse any business expenses incurred by the transcribers.

The Subcontractor Agreement signed by each of the transcribers contained confidentiality and non-compete clauses. While QMT never told transcribers they could not hire assistants, Woods and one other transcriber believed the confidentiality clause required that they personally complete all of the work assigned to them. The non-compete provision prohibited the transcribers from directly or indirectly soliciting business from the same clients served by QMT for five years after termination of the Subcontractor Agreement.

The number of hours the transcribers worked per week varied from full time to a few hours per week, depending on client need and transcriber availability. Woods testified that QMT's president urged her to work "full-time" for QMT and even offered to pay insurance benefits if Woods quit her other job. Woods opted for less than full-time, working five to eight hours daily for QMT, five days a week. QMT's president denied offering Woods full-time employment or benefits.

Woods and one other transcriber held other employment—but not as medical transcribers—at the time they worked for QMT. None of the three testifying transcribers worked for other medical transcription firms at the same time they were under contract with QMT. None held themselves out to the public as providers of transcription services. The transcribers understood they could quit working for QMT at any time and that QMT could discharge them at any time without liability.

Following the evidentiary hearing, the Appeals Tribunal concluded that Woods and all of the transcribers had an employment relationship with QMT. In separate decisions, the Appeals Referee affirmed QMT's liability for Woods' unemployment claim and the unemployment taxes for all of its transcribers. QMT sought review from the Commission, which affirmed and adopted the Appeals Referee's decisions. The Commission also issued supplemental findings of fact and conclusions of law in affirming the award of unemployment benefits to Woods.

### Standard of Review

On appeal to this court, QMT challenges the sufficiency of the evidence to support the Commission's decision on Woods' unemployment claim and the tax liability for all transcribers. Pursuant to § 288.210, we have authority to modify, reverse, remand, or set aside the decision if there is "no sufficient competent evidence" to warrant the Commission's action.

We must apply a two-step process in reviewing the Commission's findings based on the evidence presented. *Asaro v. Div. of Employment Sec.*, 32 S.W.3d 623, 626 (Mo.App. W.D.2000). First, we examine the entire record, viewing the evidence and all reasonable inferences in the light most favorable to the decision, to determine if it contains competent and substantial evidence to support the decision. *Id.* If not, the Commission's decision must be reversed. *Id.* If there is sufficient evidence, this court moves to the second step, where it views the evidence in the light most favorable to the decision but must consider *all* evidence in the record, including that which opposes or is unfavorable to the decision. *Id.* Taking account of the overall effect of the evidence, we must determine whether the Commission's award is against the overwhelming weight of the evidence. *Id.*

The Commission's findings of fact are conclusive if supported by competent and substantial evidence absent fraud. *Mo. Shelfco, Inc. v. Labor and Indus. Relations Comm'n*, 849 S.W.2d 245, 248 (Mo. App. W.D.1993). While we defer to the Commission's findings of fact, our review of the application of the law to the facts is *de novo. Stover Delivery Sys., Inc. v. Div. of Employment Sec.*, 11 S.W.3d 685, 688 (Mo.App. W.D.1999).

### Applicable Law

The issues in this case are governed by Chapter 288 of the Missouri Revised Statutes, which requires employers to make unemployment tax contributions for their employees but not for independent contractors. *Kirksville Publ'g Co. v.*

*Div. of Employment Sec.,* 950 S.W.2d 891, 895 (Mo.App. W.D.1997). A "right of control" test is used to determine whether an individual is an employee or an independent contractor, as set forth in § 288.034.5:

Service performed by an individual for remuneration shall be deemed to be employment subject to this law unless it is shown to the satisfaction of the division that such services were performed by an independent contractor. In determining the existence of the independent contractor relationship, the common law of agency right to control shall be applied. The common law of agency right to control test shall include but not be limited to: If the alleged employer retains the right to control the manner and means by which the results are to be accomplished, the individual who performs the service is an employee. If only the results are controlled, the individual performing the service is an independent contractor.

Utilizing this "right of control" test, the Division must follow "the common law rules applicable in determining the employee-employer relationship under 26 U.S.C. § 3306(i)." 8 C.S.R. 10–4.150(1). The Division must also consider the case law, Internal Revenue Service (IRS) regulations, and letter rulings interpreting § 3306(i). *Id.*

In Revenue Ruling 87–41, the IRS identified twenty factors to consider in classifying an individual as an employee or independent contractor. *Stover Delivery Sys.,* 11 S.W.3d at 691. Those factors are: (1) instructions; (2) training; (3) integration; (4) services rendered personally; (5) hiring, supervising, and paying assistants; (6) continuing relationship; (7) set hours of work; (8) full time required; (9) doing work on employer's premises; (10) order or sequence set; (11) oral or written reports; (12) payment by hour, week, month;

(13) payment of business and/or traveling expenses; (14) furnishing of tools and materials; (15) significant investment; (16) realization of profit or loss; (17) working for more than one firm at a time; (18) making service available to general public; (19) right to discharge; and (20) right to terminate. Rev. Rul. 87–41, 1987–1 C.B. 296.

■ Missouri courts routinely apply the twenty-factor test in determining the nature of the employment relationship for purposes of tax liability. *Fritts v. Div. of Employment Sec.,* 11 S.W.3d 721, 724 (Mo. App. W.D.1999). No single factor is conclusive but some may be more important than others depending upon the industry and context in which the services are performed. See *Edward Lowe Indus., Inc. v. Mo. Div. of Employment Sec.,* 865 S.W.2d 855, 860–863 (Mo.App. S.D.1993). The focus of the inquiry must be the degree to which the employer has the "right to control the manner and means of performance." *Fritts,* 11 S.W.3d at 725.

### Sufficiency of Evidence to Support Commission's Decision

■ Neither the Appeals Referee nor Commission made written findings on each factor of the IRS test. The Commission adopted the Appeals Tribunal's conclusion that "the balance of the 20 factors weighed in favor of finding an employer-employee relationship." We review the record and each of the twenty factors to determine whether the evidence supports the Commission's decision. In our listing of those factors as follows, the initial paragraph is the descriptive comment taken from Revenue Ruling 87–41.

1. *Instructions.* A worker who is required to comply with other persons' instructions about when, where, and how he or she is to work is ordinarily an employee. This control factor is present

if the person or persons for whom the services are performed has the *right* to require compliance with instructions.

QMT assigned transcription projects on a daily basis and expected the transcribers to complete the assignments by 8:00 a.m. the next day. Transcribers were required to seek an extension from QMT if assignments could not be timely completed. QMT also provided the transcribers with an instructional handout regarding the format to be used for each client's transcription. The daily assignment and instructions included the names and telephone numbers of management employees to call in QMT's central office if the transcriber had questions. If a client was dissatisfied with a completed assignment, QMT was responsible for communicating with the transcriber about any problems and making certain that future transcription assignments were done in accordance with the client's specific instructions.

Despite QMT's contention on appeal that the handout instructions were general in nature and originated from the client, it is clear that the manner and time in which the transcribers completed their assignments on a daily basis was directly controlled by QMT. Because QMT had the right to require strict compliance with its instructions, this factor indicates an employment relationship.

2. *Training.* Training a worker by requiring an experienced employee to work with the worker, by corresponding with the worker, by requiring the worker to attend meetings, or by using other methods, indicates that the person or persons for whom the services are performed want the services performed in a particular method or manner.

New transcribers received initial training from QMT in the operation of the micro-cassette recorder and particular features of the Microsoft Word program that were relevant to medical transcription. Because the transcribers already knew how to type and did not require on-going training, QMT argues that the initial training was insignificant for purposes of this second factor. We note, however, that Woods had not previously worked as a transcriber, and the evidence demonstrates it was necessary for QMT to provide some training in order for inexperienced persons to learn to operate the transcription equipment and software. Some of the transcribers could not perform their jobs without this training; thus, this factor weighs slightly in favor of employee status.

3. *Integration.* Integration of the worker's services into the business operations generally shows that the worker is subject to direction and control. When the success or continuation of a business depends to an appreciable degree upon the performance of certain services, the workers who perform those services must necessarily be subject to a certain amount of control by the owner of the business.

QMT makes no argument on appeal regarding this factor. The company president admitted at the appeals hearing that without the transcribers, QMT has no business. The transcriber's services are highly integrated into QMT's business operations. This factor clearly supports the Division's position that an employment relationship exists.

4. *Services Rendered Personally.* If the services must be rendered personally, presumably the person or persons for whom the services are performed are interested in the methods used to accomplish the work as well as in the results.

QMT required each transcriber to sign an agreement to maintain the confidentiality of the medical information revealed in

the transcription process. As a result of this confidentiality agreement, some of the transcribers believed they were personally required to do the work and could not hire anyone else to assist. At the appeals hearing, the three transcribers testified they personally performed all work assigned to them by QMT. However, the evidence is undisputed that QMT never told the transcribers they could not hire assistants. The company president testified that approximately twenty-five percent of the transcribers retained help or substitutes. This factor favors a contractual relationship because there is no evidence the transcribers were ever actually *required* to personally perform the assigned work.

5. *Hiring, Supervising, and Paying Assistants.* If the person or persons for whom the services are performed hire, supervise, and pay assistants, that factor generally shows control over the workers on the job. However, if one worker hires, supervises, and pays the other assistants pursuant to a contract under which the worker agrees to provide materials and labor under which the worker is responsible only for the attainment of a result, this factor indicates an independent contractor status.

As noted above, twenty-five percent of the transcribers paid assistants to perform transcription work. Although none of the three testifying transcribers hired assistants, they did not dispute the testimony of QMT's president that other transcribers engaged in this practice. This factor favors QMT.

6. *Continuing Relationship.* A continuing relationship between the worker and the person or persons for whom the services are performed indicates that an employer-employee relationship exists. A continuing relationship may exist where work is performed at frequently recurring although irregular intervals.

QMT does not dispute the Commission's finding that the transcribers had a continuing relationship with QMT. Woods worked for QMT consistently from July 2000 until her discharge in January 2001. The other two testifying transcribers had each worked for QMT for more than three years. None of the transcribers were retained by QMT for a single assignment or on an irregular basis. This factor favors an employment relationship.

7. *Set Hours of Work.* The establishment of set hours of work by the person or persons for whom the services are performed is a factor indicating control.

The transcribers were required to pickup their daily assignments between 11:00 a.m. and 2:00 p.m. The completed transcriptions were due in QMT's offices the following morning by 8:00 a.m. The Appeals Referee found that QMT indirectly set transcribers' hours by imposing strict deadlines for completion of the work. Viewed in a light most favorable to the Commission's decision, this finding is supported by the evidence. This factor leans toward an employment relationship.

8. *Full Time Required.* If the worker must devote substantially full time to the business of the person or persons for whom the services are performed, such person or persons have control over the amount of time the worker spends working and impliedly restrict the worker from doing other gainful work. And independent contractor on the other hand, is free to work when and for whom he or she chooses.

Only one of the three testifying transcribers worked full-time for QMT. Although Woods testified the company president urged her to work full-time, there is no evidence that any of the transcribers were restricted from other gainful employ-

ment at the time they worked for QMT.[1] This factor suggests the existence of a contractual relationship.

9. *Doing Work on Employer's Premises.* If the work is performed on the premises of the person or persons for whom the services are performed, that factor suggests control over the worker, especially if the work could be done elsewhere. Work done off the premises of the person or persons receiving the services, such as at the office of the worker, indicates some freedom from control. However, this fact by itself does not mean that the worker is not an employee. The importance of this factor depends on the nature of the service involved and the extent to which an employer generally would require that employees perform such services on the employer's premises. Control over the work is indicated when the person or persons for whom the services are performed have the right to compel the worker to travel a designated route, to canvass a territory within a certain time, or to work at specific places as required.

The transcribers performed all of their work at home. QMT did not require the work to be performed at any specific location. This factor indicates a contractual relationship.

10. *Order or Sequence Set.* If a worker must perform services in the order or sequence set by the person or persons for whom the services are performed, that factor shows that the worker is not free to follow the worker's own pattern of work but must follow the established routines and schedules of the person or persons for whom the services are performed.

Transcribers testified that QMT would occasionally dictate priority for one transcription project over another when multiple assignments were given. The Commission found that QMT indirectly set the order or sequence of work by making daily assignments and requiring completion of the transcriptions by 8:00 a.m. the following work day. This finding is supported by the evidence and weighs in favor of an employment relationship.

11. *Oral or Written Reports.* A requirement that the worker submit regular or written reports to the person or persons for whom the services are performed indicates a degree of control.

The transcribers were required to regularly submit two written reports on forms provided by QMT. On a daily basis, the transcribers filled out a "job sheet" for each transcription assignment to indicate which patient records had been transcribed and whether there were any discrepancies. On a weekly basis, the transcribers submitted "work logs," which summarized all completed assignments and the total number of characters transcribed. The mandatory submission of these forms indicates an element of control and favors the Division's position.

12. *Payment by Hour, Week, Month.* Payment by the hour, week, or month generally points to an employer-employee relationship, provided that this method of payment is not just a convenient way of giving a lump sum agreed upon as the cost of a job. Payment made by the job or on a straight commission gen-

---

1. In its supplemental decision on Woods' unemployment claim, the Commission concluded the non-compete clause (in the Subcontractor Agreement) indicates QMT intended to have an exclusive relationship with the transcribers. We disagree. The non-compete clause prohibited the transcribers from soliciting any of QMT's clients for five years from the date of *termination* of the agreement. This clause did not prohibit the transcribers from working for other employers while performing services for QMT.

erally indicates that the worker is an independent contractor.

The transcribers were paid weekly, based on the number of characters transcribed. QMT set the rate of pay and established a regular payday each Friday. This factor tends to indicate an employment relationship based on the regularity of payment.

13. *Payment of Business and/or Traveling Expenses.* If the person or persons for whom the services are performed ordinarily pay the worker's business and/or traveling expenses, the worker is ordinarily an employee. An employer, to be able to control expenses, generally retains the right to regulate and direct the worker's business activities.

The transcribers incurred business-related expenses for computer equipment, internet access, second telephone lines, and gasoline. None of these expenses were paid or reimbursed by QMT. This factor weighs in favor of a contractual relationship.

14. *Furnishing Tools and Materials.* The fact that the person or persons for whom the services are performed furnished significant tools, materials, and other equipment tends to show the existence of an employer-employee relationship.

The transcribers furnished their own computer equipment, the most significant and expensive tools required to perform the transcription work. The fact that the transcribers also used this equipment for personal reasons does not detract from its business significance given the nature of the work. On a few occasions, QMT loaned out micro-cassette recorders, headphones, or foot pedals, but more than ninety percent of the transcribers utilized equipment that was not provided by QMT.

This factor suggests the transcribers were independent contractors.

15. *Significant Investment.* If the worker invests in facilities that are used by the worker in performing services and are not typically maintained by employees (such as maintenance of an office rented at fair market value from an unrelated party), that factor tends to indicate that the worker is an independent contractor. On the other hand, lack of investment in facilities indicates dependence on the person or persons for whom the services are performed for such facilities and, accordingly, the existence of an employer-employee relationship. Special scrutiny is required with respect to certain types of facilities, such as home offices.

The transcribers did not have any significant investment in facilities as they worked out of their homes. However, because they were home-based, the transcribers were not dependent on QMT for a place to perform their services. This factor is neutral as it does not weigh clearly in either party's favor.

16. *Realization of Profit or Loss.* A worker who can realize a profit or loss as a result of the worker's services (in addition to the profit or loss ordinarily realized by employees) is generally an independent contractor, but the worker who cannot is an employee. For example, if the worker is subject to a real risk of economic loss due to significant investments or a bona fide liability for expenses, such as salary payments to unrelated employees, that factor indicates that the worker is an independent contractor.

QMT makes no argument regarding this factor. The record reflects the transcribers cannot realize a profit or incur a loss beyond that ordinarily realized by an employee. The only way they can make more

money is to transcribe more documents. Since the transcribers have no significant investment in facilities or computer equipment separate and apart from what they can also use personally, the risk of economic loss is not a business risk. This factor favors an employment relationship.

17. *Working for More Than One Firm at a Time.* If a worker performs more than *de minimis* services for a multiple of unrelated persons or firms at the same time, that factor generally indicates that the worker is an independent contractor. However, a worker who performs services for more than one person may be an employee of each of the persons, especially where such persons are part of the same service arrangement.

None of the testifying transcribers worked for other medical transcription firms at the same time they performed services for QMT. Two of the transcribers, including Woods, held other unrelated employment. QMT's president testified that some transcribers worked for other physicians or hospitals. However, viewed in a light most favorable to the Commission's decision, the evidence could support a finding that the transcribers were employees of QMT even if they also held other part-time jobs. This factor is neutral, as the totality of the evidence does not clearly favor an employment or contractual relationship.

18. *Making Services Available to General Public.* The fact that a worker makes his or her services available to the general public on a regular and consistent basis indicates an independent contractor relationship.

None of the transcribers who testified held themselves out to the public as performing medical transcription services. They did not advertise or have business cards. QMT's president testified that some transcribers had done work for others and held themselves out to the public as transcribers. However, there was no evidence that this was done on a regular and consistent basis. This factor tends to support an employment relationship.

19. *Right to Discharge.* The right to discharge a worker is a factor indicating that the worker is an employee and the person possessing the right is an employer. An employer exercises control through the threat of dismissal, which causes the worker to obey the employer's instructions. An independent contractor, on the other hand, cannot be fired so long as the independent contractor produces a result that meets the contract specifications.

The transcribers understood they could be discharged by QMT at any time. The record reflects that QMT terminated Woods and other transcribers due to concerns about the quality of their work, even though the transcribers had not breached the Subcontractor Agreement. The exercise of this right to discharge indicates an employment relationship.

20. *Right to Terminate.* If the worker has the right to end his or her relationship with the person for whom the services are performed at any time he or she wishes without incurring liability, that factor indicates an employer-employee relationship.

QMT does not dispute that the transcribers could terminate their services at any time. Those who quit were paid for partial performance and did not incur liability to QMT. This factor strongly suggests an employment relationship.

A composite analysis of all twenty factors indicates that QMT exercised a significant degree of control over the manner and means by which the transcribers provided services to QMT's clients. Because

the transcription services are fundamental to its business, QMT seeks to maintain high quality work standards by regularly using the same transcribers, assigning daily work specifying the format in which documents are transcribed, monitoring progress through written reports, and requiring daily deadlines to be met. The evidence is competent and substantially supports the Commission's decision that the transcribers were employed by QMT. While a few factors of the IRS test lean toward a contractual relationship, a substantial majority of the factors indicate QMT exercised the requisite degree of control to indicate an employment relationship. Thus, the Commission's decision is not against the overwhelming weight of the evidence.

We have reviewed the two IRS decisions that QMT argues are instructive in deciding this matter. In *Revenue Ruling,* 1970 WL 21078, Rev. Rul. 70–340, 1970–1 C.B. 202, the IRS concluded that transcribers were not employees of a court reporter who retained them to "handle his own overflow transcription work." On an as needed basis, the transcribers picked up tapes and later returned the completed transcriptions of legal proceedings to the court reporter with a billing statement. Rev. Rul. 70–340. This IRS ruling is distinguished from the instant case because the legal transcribers only "occasionally" performed work for the court reporter and were not required to strictly comply with daily deadlines. *Id.*

Similarly unavailing is *Technical Advice Memorandum, TAM 9535002, 1995 WL 517790 (Sept. 01, 1995),* wherein the IRS determined that a hospital engaged medical transcribers on an independent contractor basis. The hospital provided the transcribers with computer software, disks, and initial training on the computer applications. The transcribers worked at home, furnished their own computers, and were not reimbursed for expenses. The facts, however, fundamentally differ from QMT's situation because the medical transcribers were not an integral part of the hospital's primary business. Moreover, the hospital's contractual agreement specified that the transcribers could terminate the relationship only upon thirty days notice. Unlike the instant case, the hospital's transcribers could incur liability for immediate termination of their services, thereby indicating independent contractor status.

QMT established an employment relationship with its medical transcribers by controlling not only the results of the work product but also the time, manner, and means of performance. The record supports the Commission's determinations that QMT is liable for unemployment benefits for Dorothy Woods and unemployment taxes on behalf of all the medical transcribers. We affirm.

All concur.