

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

GATEWAY TAXI MANAGEMENT, )
 )
    Appellant, )
 ) **WD76886**
v. )
 ) **OPINION FILED:**
 ) **July 29, 2014**
DIVISION OF EMPLOYMENT )
SECURITY, )
 )
    Respondent. )

**Appeal from the Labor and Industrial Relations Commission**

**Before Division One:**  Mark D. Pfeiffer, Presiding Judge, and
Lisa White Hardwick and Karen King Mitchell, Judges

Gateway Taxi Management d/b/a Laclede Cab Company (Laclede) appeals the Missouri Labor and Industrial Relations Commission's decision that taxicab drivers "performed services for wages in employment" for Laclede. Laclede raises two points on appeal. In its first point, it contends that the Commission erred in applying the section 288.034.5[1] presumption to conclude that Laclede employed taxicab drivers and that fares paid by customers to drivers were subject to unemployment taxation in that section 288.090.2 expressly limits the imposition of unemployment taxation to wages paid by employers, and the overwhelming weight of the

---

[1] All statutory references are to the Missouri Revised Statutes, as updated through the 2012 Cumulative Supplement, unless otherwise indicated.

evidence does not support the conclusion that Laclede paid drivers anything, much less wages, given that the undisputed testimony established that the funds at issue were paid to drivers by taxicab customers, not by Laclede.

In its second point, Laclede alternatively contends that the Commission erred in finding that the taxicab drivers are employees in that the overwhelming weight of the evidence establishes that the drivers are independent contractors in that the factors weigh almost uniformly in favor of independent contractors, including particularly the facts that Laclede does not retain the right to control the manner and means by which drivers perform their jobs and does not exercise pervasive control exceeding to any significant degree the scope of control imposed by the Missouri legislature in the Metropolitan Taxicab Commission Vehicle for Hire Code.[2]

We reverse.

## Factual and Procedural Background

Laclede operates a taxi dispatch service in St. Louis, Missouri. The cab drivers who use the dispatch service may lease cabs from Gateway Taxi Service or use their own vehicles. There are two different leasing arrangements available to drivers who lease cabs from Gateway: shift and open shift. Shift drivers pay a daily fee (known as a "pro fee") to lease the cab for twelve-hour shifts. They also pick up and drop off the cabs for a designated shift (4:00 a.m. until 4:00 p.m. or 4:00 p.m. until 4:00 a.m.). Open shift drivers pay a higher pro fee than shift drivers, and they lease their cabs for a 24-hour period. Open shift drivers may work hours of their choosing and are not limited to any particular shift. Shift drivers may choose the hours they work during the shift for which they lease the vehicle, although they are obviously limited to working the hours within the lease period. Drivers who use their own vehicles pay a flat weekly

---

[2] The Metropolitan Taxicab Commission is herein referred to as the MTC, and the Vehicle for Hire Code is referred to as the VHC.

2

fee to Laclede. Regardless of which lease arrangement the drivers choose or whether the drivers use their own vehicles, the drivers keep all of the fares they receive; they do not share any fares with Laclede. Furthermore, the drivers do not provide Laclede with any information about the fares they receive. The only payments drivers make to Laclede are security deposits, the pro fee, and a ten percent charge for processing of credit card charges and cashing in of vouchers provided by customers who have ongoing arrangements with Laclede. Laclede pays for insurance and maintenance of the vehicles, and the drivers pay for cleaning and gasoline for the vehicles.

On May 10, 2012, a Commission deputy determined that certain taxicab drivers "performed services in employment as defined in Section 288.034" for Laclede, and that the drivers "received remuneration for services which constitutes wages as defined in Section 288.036." The deputy further determined that "[i]t has not been shown to the satisfaction of the Division that these individuals are independent contractors."

On May 22, 2012, Laclede timely appealed the deputy's determination, contending as follows:

> Gateway disputes the Division's findings that those who have performed services as taxi cab drivers since January 1, 2009, have performed services in employment as defined in section 288.034 of the Missouri Employment Security Law. Gateway maintains its position that the aforementioned individuals are not employees, but are instead, independent contractors.

On August 27, 2012, the Appeals Tribunal held a hearing on Laclede's appeal. Four witnesses testified at the hearing: David McNutt, chief executive officer of Laclede; Gregory Parent and Mario Berry, former cab drivers for Laclede; and Renee Rodrique, the deputy who made the initial determination of tax liability in this case. In addition to the testimony of the four witnesses, other evidence before the Commission included: the Metropolitan St. Louis Taxicab Commission's Vehicle for Hire Code, the code of regulations governing provision of taxi service

3

in St. Louis; a record of Field Reports of Wages for the relevant periods; the Worker Relationship Questionnaire, a form provided by the Division and completed by Laclede's controller; and the independent contractor agreement, which Laclede required the drivers to sign.

On October 9, 2012, an Appeals Tribunal reversed the deputy's determination, finding that the drivers "did not perform services for wages in employment" by Laclede. Specifically, the Appeals Tribunal determined that the remuneration received by the drivers constituted "wages" under section 288.036, but that the drivers were independent contractors.

On October 26, 2012, the Division of Employment Security timely appealed the decision of the Appeals Tribunal. The Division contended that the Appeals Tribunal erred in reversing the deputy's determination that the drivers "performed services for 'wages' in 'employment' by Gateway . . . within the meaning of those terms as defined in Sections 288.034 and 288.036." The parties filed briefs, and the Commission held a hearing. On August 22, 2013, the Commission, in a divided opinion, entered its final decision, reversing the decision of the Appeals Tribunal and finding that the "drivers performed services for wages in employment by Gateway."[3] The Commission's decision became final for purposes of appeal ten days later, under section 288.200.2. On September 19, 2013, Laclede timely filed its notice of appeal with the Commission.

## Standard of Review

This court reviews final decisions of the Commission pursuant to section 288.210, which provides:

> The court, on appeal, may modify, reverse, remand for rehearing, or set aside the decision of the commission on the following grounds and no other:
>
> (1) That the commission acted without or in excess of its powers;

---

[3] One commissioner dissented, finding that the drivers were independent contractors.

(2) That the decision was procured by fraud;

(3) That the facts found by the commission do not support the award; or

(4) That there was no sufficient competent evidence in the record to warrant the making of the award.

"Decisions of the Commission 'which are clearly the interpretation or application of the law, as distinguished from a determination of facts, are not binding upon us and fall within our province of review and correction.'" *K & D Auto Body, Inc. v. Div. of Emp't Sec.*, 171 S.W.3d 100, 102 (Mo. App. W.D. 2005) (quoting *Merriman v. Ben Gutman Truck Serv., Inc.*, 392 S.W.2d 292, 297 (Mo. 1965)). "'We independently review such questions without giving any deference to the Commission's conclusions.'" *Id.* at 103 (quoting *CNW Foods, Inc. v. Davidson*, 141 S.W.3d 100, 102 (Mo. App. S.D. 2004)). "Moreover, where the Commission's 'finding of ultimate fact is reached by the application of rules of law instead of by a process of natural reasoning from the facts alone, it is a conclusion of law and subject to our reversal.'" *Id.* (quoting *Merriman*, 392 S.W.2d at 297).

> Accordingly, in reviewing the correctness of the Commission's legal conclusion that, based on the facts found by the Commission, the drivers in question were employees . . . rather than independent contractors, we exercise our own independent judgment and do not defer to the Commission's conclusion, including the way in which it arrived at that conclusion by balancing, weighing, and applying the various facts it found.

*Id.*

On the other hand, we treat the Commission's factual findings deferentially. *Id.*; § 288.210. When reviewing the Commission's factual findings, we do not substitute our judgment for that of the Commission. *K & D Auto Body*, 171 S.W.3d at 103. "Rather, '[a]bsent fraud, the Commission's factual findings are conclusive on appeal if they are supported by competent and substantial evidence upon the whole record and are not clearly against the overwhelming weight of the evidence.'" *Id.* (quoting *CNW Foods*, 141 S.W.3d at 102).

5

**Analysis**

"Pursuant to the Missouri Employment Security Law, [sections] 288.010-.390, employers are required to make unemployment tax contributions for their employees, but not for independent contractors." *Nat'l Heritage Enters., Inc. v. Div. of Emp't Sec.*, 164 S.W.3d 160, 166 (Mo. App. W.D. 2005); §§ 288.020.1 and 288.034.5. Laclede argues that the Commission erred in finding that the taxicab drivers were its employees under section 288.034.5. Section 288.034 defines "employment." Subsection 5 of § 288.034 provides:

> Service performed by an individual for remuneration shall be deemed to be employment subject to this law unless it is shown to the satisfaction of the division that such services were performed by an independent contractor. In determining the existence of the independent contractor relationship, the common law of agency right to control shall be applied. The common law of agency right to control test shall include but not be limited to: if the alleged employer retains the right to control the manner and means by which the results are to be accomplished, the individual who performs the service is an employee. If only the results are controlled, the individual performing the service is an independent contractor.

The first sentence of section 288.034.5 creates "a presumption that service performed by an individual for remuneration is 'employment' subject to Missouri's Unemployment Law. The presumption is overcome by satisfying the Division 'that such services were performed by an independent contractor.'" *Higgins v. Mo. Div. of Emp't Sec.*, 167 S.W.3d 275, 283 (Mo. App. W.D. 2005) (quoting § 288.034.5).

Thus, the first step in determining whether a worker is engaged in "employment" is to determine whether he or she "performed services for remuneration." *Burns v. Labor & Indus. Relations Comm'n*, 845 S.W.2d 553, 555 (Mo. banc 1993). "Once it is shown that an individual receives remuneration, the presumption of an employer-employee relationship is established. The burden of proof [then] shifts to the employer to show that, under the common law right to

6

control test, the worker is an independent contractor." *Bedford Falls Co. v. Div. of Emp't Sec.*, 998 S.W.2d 851, 856 (Mo. App. W.D. 1999).

The Commission determined that Laclede "paid considerable remuneration to drivers during the calendar quarters following January 1, 2009." Thus, the presumption provided for in the first sentence of section 288.034.5 applied, and Laclede "had the burden of proving it was not the employer of each of the drivers."[4] Next, the Commission concluded that Laclede failed to meet its burden in that it did not prove that the drivers were independent contractors. Laclede alleges that the Commission erred in two ways. First, Laclede claims that the Commission erred in finding that the presumption set out in the first sentence of section 288.034.5 applied in this case because section 288.090.2 requires an employer to make contributions to the unemployment security fund only on wages *paid by* that employer, and the overwhelming weight of the evidence did not support a finding that Laclede *paid* the taxicab drivers wages (Point I). Second, even if the presumption did apply, Laclede claims the Commission erred in finding that the taxicab drivers were employees of Laclede because the overwhelming weight of the evidence established that the drivers were independent contractors (Point II).

Because we find that even if the presumption in the first sentence of section 288.034.5 applies, the evidence established that the drivers were independent contractors, we reverse the Commission's determination based on Laclede's Point II and do not address the argument raised by Laclede in its Point I.

In its second point, Laclede contends that the Commission erred in finding that the taxicab drivers are employees because the overwhelming weight of the evidence evaluated under either the common law "right to control" test or the IRS's twenty-factor test establishes that the

---

[4] The Division also stated in its brief before the Commission that "[i]f a worker has been paid by a business, 'there is a presumption of an employer-employee relationship[.]'" (quoting *E.P.M. v. Buckman*, 300 S.W.3d 510, 513 (Mo. App. W.D. 2009)).

drivers are independent contractors in that the factors weigh almost uniformly in favor of independent contractors, particularly the facts that Laclede does not retain the right to control the manner and means by which drivers perform their jobs and does not exercise pervasive control exceeding to any significant degree the scope of control imposed by the Missouri legislature in the Metropolitan Taxicab Commission Vehicle for Hire Code.

In determining whether a worker is an employee or an independent contractor, we must employ a "right of control" test. § 288.034.5. "Utilizing this 'right of control' test, the Division must follow 'the common law rules applicable in determining the employee-employer relationship under 26 U.S.C. § 3306(i).'" *Quality Med. Transcription, Inc. v. Woods*, 91 S.W.3d 181, 185 (Mo. App. W.D. 2002) (quoting 8 C.S.R. § 10-4.150(1)). "The Division must also consider the case law, Internal Revenue Service (IRS) regulations, and letter rulings interpreting § 3306(i)." *Id.*

> In Revenue Ruling 87-41, the IRS identified twenty factors to consider in classifying an individual as an employee or independent contractor. Those factors are: (1) instructions; (2) training; (3) integration; (4) services rendered personally; (5) hiring, supervising, and paying assistants; (6) continuing relationship; (7) set hours of work; (8) full time required; (9) doing work on employer's premises; (10) order or sequence set; (11) oral or written reports; (12) payment by hour, week, month; (13) payment of business and/or traveling expenses; (14) furnishing of tools and materials; (15) significant investment; (16) realization of profit or loss; (17) working for more than one firm at a time; (18) making service available to general public; (19) right to discharge; and (20) right to terminate.

*Id.* (citing Rev. Rul. 87-41, 1987-1 C.B. 296) (internal citation omitted). "Missouri courts routinely apply the twenty-factor test in determining the nature of the employment relationship for purposes of tax liability." *Id.* "No single factor is conclusive but some may be more important than others depending upon the industry and context in which the services are performed." *Id.* "The focus of the inquiry must be the degree to which the employer has the

'right to control the manner and means of performance.'" *Id.* (quoting *Fritts v. Div. of Emp't Sec.*, 11 S.W.3d 721, 725 (Mo. App. W.D. 1999)).

Because it affects our analysis under the twenty-factor test in this case, we note as an initial matter that the VHC is part of the record in this case. The VHC, as authorized by sections 67.1812 and 67.1816 of the Missouri Revised Statutes and adopted by St. Louis County and St. Louis City under local ordinance, regulates cab drivers in the St. Louis area. To the extent that Laclede requires drivers to adhere to VHC rules, we note that "'reasonable efforts to insure compliance with government regulations do not evidence control unless pervasive control by the employer exceeds to a significant degree the scope of the government imposed control.'" *K & D Auto Body*, 171 S.W.3d at 106 (quoting *Travelers Equities Sales, Inc. v. Div. of Emp't Sec.*, 927 S.W.2d 912, 918 (Mo. App. W.D. 1996)) (internal quotation marks omitted).

> 1. *Instructions.* A worker who is required to comply with other persons' instructions about when, where, and how he or she is to work is ordinarily an employee. This control factor is present if the person or persons for whom the services are performed have the *right* to require compliance with instructions.[5]

"With respect to the 'instructions' factor, the right to control is manifested in control over the 'when, where and how' work is completed." *Kirksville Publ'g Co. v. Div. of Emp't Sec.*, 950 S.W.2d 891, 897 (Mo. App. W.D. 1997). In analyzing this factor, we are mindful of the fact that to a certain extent, the inherent nature of cab driving, not Laclede, dictates the "when" and "where" of the drivers' work. *See K & D Auto Body*, 171 S.W.3d at 106.

As to what the record indicates in regard to "when" the drivers complete their work, the independent contractor agreement provides that

> [t]he number of hours to be worked by Driver are to be determined at the sole discretion of Driver, and it is understood that Laclede does not require Driver to

---

[5] In our analysis under the twenty-factor test, the initial paragraph under each factor is the descriptive comment quoted directly from Revenue Ruling 87-41.

work any particular hours or any hours whatsoever. It is agreed that Laclede shall have no control over Driver's hours worked or scheduling.

The worker relationship questionnaire states that Laclede does not know how many hours per week the driver performs services for the business, and it does not set hours of work for the drivers. There are two types of drivers: open shift drivers, who lease a cab or use their own vehicle and have access to the vehicle 24 hours a day; and shift drivers, who choose to pay a lower pro fee and have access to a leased cab either from 4:00 a.m. until 4:00 p.m. or from 4:00 p.m. until 4:00 a.m. McNutt, Laclede's CEO, testified that shift drivers are not required to work during the shift when the cab is available to them, but they are required to pay the pro fee, and that open shift drivers do not have to work any particular shift. He testified that a driver can work however many hours he chooses or not at all. McNutt's testimony was consistent with that of Berry, an open shift driver, who testified that it was solely within his discretion how many hours he worked. However, Parent, a shift driver, testified that he was required to work twelve-hour shifts, six days per week. This evidence indicates that with the possible exception of shift drivers, Laclede does not explicitly control when the drivers perform their services. (See factors 7 and 8 for a more thorough analysis of this.)

Concerning "where" the drivers perform their work, the independent contractor agreement provides that "[d]river shall have sole discretion in determining where to pick up non-dispatched, non-charge passengers within the City of St. Louis, Missouri, including the selection of waiting areas or cab stands. It is agreed that Laclede shall have no control over Driver in those respects." The worker relationship questionnaire provides that the driver "has complete control over where services are performed, subject only to limitations and guidelines imposed by the Metropolitan Taxi Commission." Berry testified that it was solely within his discretion where he drove his cab and that drivers could choose any zone in which to drive their

10

cabs. The evidence indicates that Laclede did not control where the drivers performed their work.

Regarding "how" the drivers complete their work, the independent contractor agreement provides that "[i]f Driver accepts delivery/pickup from Laclede, Driver shall determine the shortest, most direct route taken (as required by City Ordinance), his starting and quitting time, and his location at any given time." The worker relationship questionnaire provides that the drivers are not "given instructions in the way the work is to be done (exclusive of actual training [discussed in factor 2, *infra*])." The questionnaire also provides that the business does not have the right to supervise the drivers in the performance of their service. McNutt testified that a driver can determine his own route in transporting a passenger, as long as the driver is compliant with the VHC, which requires drivers to take the most direct route. He also testified that a driver determines whether to pick up a fare or not, and that a driver can choose to reject every potential fare from dispatch. The drivers' testimony confirmed that it was within their discretion to accept or decline a fare.

The Commission determined that Laclede gave the drivers additional instructions regarding: 1) "not carrying cellular telephones with them [and] having regular customers call its dispatch system instead of contacting the drivers directly," 2) "giving preferential treatment to dispatch and voucher customers," and 3) "with respect to any drivers using their own vehicles, mandat[ing] that they paint and sign the exterior of the vehicle in conformity with the rest of its fleet." The Commission determined that Laclede's "additional instruction weighs in favor of an employer-employee relationship."

As to painting and signage of driver-owned taxicabs, the independent contractor agreement provides that "[a]ll vehicles to be operated as a taxicab under this Agreement must be painted with the appropriate and authorized colors, logo, trademark, symbols, and lettering, and

11

furnished with all the necessary equipment." However, these requirements do not differ significantly from those of the VHC.

We agree with the Commission that there was evidence that Laclede instructed drivers not to carry cellular telephones, to have regular customers call its dispatch system instead of contacting the drivers directly, and to give preferential treatment to dispatch and voucher customers, and that these instructions exceeded the requirements of the VHC. However, we disagree with the Commission that this level of control by Laclede means this factor should weigh in favor of employee status. Laclede has minimal control over the "when" of the drivers' services, almost no control over the "where" of the services, and, relatively speaking,[6] little control over the "how" of the services. We find that the control exerted by Laclede is not enough to weigh this factor in favor of employee status. Rather, we find that this factor weighs in favor of independent contractor status.

> 2. *Training.* Training a worker by requiring an experienced employee to work with the worker, by corresponding with the worker, by requiring the worker to attend meetings, or by using other methods, indicates that the person or persons for whom the services are performed want the services performed in a particular method or manner.

Regarding training, the VHC states that "[s]ubject to the Director's approval, CCN [certificate of convenience and necessity] holders must develop and implement a training program and procedure manual for licensed cab drivers that are affiliated with that CCN Holder. At a minimum, the program and manual should deal with general street knowledge, basic customer service skills, and safety." The worker relationship questionnaire states that the driver "is trained in use of computer; this permits him to accept trips if he chooses. He is also trained in MTC guidelines and general safety procedures." The drivers are trained by the general manager or a designee. The independent contractor agreement provides that "Laclede will provide

---

[6] *Cf. Higgins v. Mo. Div. of Emp't Sec.*, 167 S.W.3d 275, 284-86 (Mo. App. W.D. 2005).

instructions and orientation in Laclede's system of operation and, insofar as it is required by law, ordinance or insurance related rules and safety training."

McNutt testified that training is required by the VHC and that the training Laclede provides is intended to comply with the VHC. Specifically, Laclede provides training regarding the best places to pick up customers and to ensure an individual can operate a vehicle safely. Parent testified that he received safety training and "a little classroom instruction for a few hours and somebody went out with us one day[,] showed us how the credit card machine worked and everything and that's pretty much it. Minimal amount of training." Berry testified that the training involved a supervisor teaching the drivers how to properly drive and interact with customers. We find that the training provided by Laclede does not "exceed[] to a significant degree the scope" of the training required by the VHC. Therefore, this factor is neutral.

> 3. *Integration.* Integration of the worker's services into the business operations generally shows that the worker is subject to direction and control. When the success or continuation of a business depends to an appreciable degree upon the performance of certain services, the workers who perform those services must necessarily be subject to a certain amount of control by the owner of the business.

"The integration factor refers to whether a business could continue without the contribution of the services in question . . . ." *Nat'l Heritage Enters., Inc.*, 164 S.W.3d at 168. We find that the drivers in this case were highly integrated into Laclede's business. The drivers' sole service was to drive cab customers. Laclede's business is operating a taxicab dispatch service and leasing taxicabs.[7] Thus, Laclede's business could not continue without the services provided by the drivers. *Accord, K & D Auto Body*, 171 S.W.3d at 107 (finding that the success and continuation of a towing business clearly depended, to an appreciable degree, upon the performance of its drivers' services); *Stover Delivery Sys., Inc. v. Div. of Emp't Sec.*, 11 S.W.3d

---

[7] The record indicates that Laclede provides the dispatch service, while Gateway Taxi Management owns, leases, and repairs the vehicles.

13

685, 692 (Mo. App. W.D. 1999) (finding drivers highly integrated because their pickups and deliveries "were the only service provided by the company"); *but see Nat'l Heritage Enters., Inc.*, 164 S.W.3d at 168; *Fritts v. Williams*, 992 S.W.2d 375, 381 (Mo. App. S.D. 1999) (finding that where an independent contractor is just as capable of performing the services at issue as are employees, that fact cuts against a finding that the worker's services were integrated into the business operations of the employer). Because Laclede's business is entirely dependent upon providing cab service—the very service performed by the workers at issue—this factor weighs in favor of employee status.

4. *Services Rendered Personally.* If the services must be rendered personally, presumably the person or persons for whom the services are performed are interested in the methods used to accomplish the work as well as in the results.

The independent contractor agreement provides that "Driver agrees that s/he will not allow anyone other than Driver to operate vehicle, radio or dispatching service." In the worker relationship questionnaire, Laclede indicated that the drivers are "required to perform the service personally." McNutt testified that the Metropolitan Taxicab Commission does not allow a driver to lease or sublease a cab to another person, and that a driver cannot permit anyone else to operate the vehicle. However, the Labor and Industrial Relations Commission determined that because the VHC permitted Laclede to use only properly licensed Laclede drivers, this requirement "was simply an extension of the Code." We agree with the Commission and find that this factor is neutral.

5. *Hiring, Supervising, and Paying Assistants.* If the person or persons for whom the services are performed hire, supervise, and pay assistants, that factor generally shows control over the workers on the job. However, if one worker hires, supervises, and pays the other assistants pursuant to a contract under which the worker agrees to provide material and labor and under which the worker is responsible only for the attainment of a result, this factor indicates an independent contractor status.

14

There is nothing in the record to indicate that the drivers have assistants, and the nature of driving a cab indicates that this is not a factor. Consequently, we find that this factor is inapplicable.

> 6. *Continuing Relationship.* A continuing relationship between the worker and the person or persons for whom the services are performed indicates that an employer-employee relationship exists. A continuing relationship may exist where work is performed at frequently recurring although irregular intervals.

The Commission determined that the "best evidence" indicated that drivers often worked for Laclede "for long periods of time," and that because the drivers could work for only one company at a time, "the drivers generally put their full-time efforts into [Laclede's] business." The Commission determined that "[t]he on-going and continuous relationships suggested the right, if not the actual exercise, of control," and that this factor weighed in favor of employee status. It is not clear what "best evidence" the Commission relied upon. Parent testified that he worked for Laclede for two weeks. Berry testified that he worked for Laclede for five months. The field reports of wages indicate that some drivers worked for Laclede for long periods, while others did not. Because there is insufficient evidence in the record regarding this factor, we find it to be neutral.

> 7. *Set Hours of Work.* The establishment of set hours of work by the person or persons for whom the services are performed is a factor indicating control.

> The independent contractor agreement provided that

> [t]he number of hours to be worked by Driver are to be determined at the sole discretion of Driver, and it is understood that Laclede does not require Driver to work any particular hours or any hours whatsoever. It is agreed that Laclede shall have no control over Driver's hours worked or scheduling.

It appears that the only drivers arguably subject to set hours of work are those who pay the shift fee to lease a cab. In that case, the driver is leasing the cab for twelve hours per day; either the 4:00 a.m. until 4:00 p.m. shift, or the 4:00 p.m. until 4:00 a.m. shift. Thus, the cab is available,

15

and the driver can work, only during the shift for which s/he has access to the vehicle.  McNutt testified that "the bulk" of the arrangements are open shift, which means the drivers lease the cabs for a full 24-hour day.  In those cases, there are no hours of work set by Laclede.  We find that this factor weighs in favor of independent contractor status.

> 8. *Full Time Required.*  If the worker must devote substantially full time to the business of the person or persons for whom the services are performed, such person or persons have control over the amount of time the worker spends working and impliedly restrict the worker from doing other gainful work.  An independent contractor on the other hand, is free to work when and for whom he or she chooses.

> The independent contractor agreement provides that

> [t]he number of hours to be worked by Driver are to be determined at the sole discretion of Driver, and it is understood that Laclede does not require Driver to work any particular hours or any hours whatsoever.  It is agreed that Laclede shall have no control over Driver's hours worked or scheduling.

The worker relationship questionnaire states that Laclede does not know how many hours per week the driver performs services for the business, and it does not set hours of work for the drivers.  Parent, a shift driver, testified, however, that the Laclede employee who interviewed the drivers told them they had to work full time and could not work part time.  He testified that the agreement was "you drive a taxi 12 hours a day, six days a week."  He testified that he was not free to choose his own hours, and that Laclede said he "could have early shift or late shift[;] that was your only choice."  He testified that he worked 4:00 a.m. until 4:00 p.m. six days a week, and that that was "a requirement."  Berry, an open shift driver, testified that drivers could work as long as they wanted, but that he worked an average of eight to ten hours per day, six days per week.

Although there was conflicting evidence, there was evidence to support the conclusion that Laclede required shift drivers to work full time, but it did not have any explicit requirement that open shift workers work full time.  However, as the Commission found, the pro arrangement

16

necessitated that all drivers work full time. *See Stover*, 11 S.W.3d at 693 (despite drivers'

freedom to work only the number of hours required to complete their routes, fact that drivers'

routes required them to work from 40 to 72 hours per week "necessitated substantially full-time

commitments"). Thus, we find this factor to weigh in favor of employee status.

> 9. *Doing Work on Employer's Premises.* If the work is performed on the premises of the person or persons for whom the services are performed, that factor suggests control over the worker, especially if the work could be done elsewhere. Work done off the premises of the person or persons receiving the services, such as at the office of the worker, indicates some freedom from control. However, this fact by itself does not mean that the worker is not an employee. The importance of this factor depends on the nature of the service involved and the extent to which an employer generally would require that employees perform such services on the employer's premises. Control over the place of work is indicated when the person or persons for whom the services are performed have the right to compel the worker to travel a designated route, to canvass a territory within a certain time, or to work at specific places as required.

The Commission determined that "the taxis were the property of [Laclede] (whether

leased or licensed) and were an extension of [Laclede]. Thus, the drivers were always working

on [Laclede's] property." However, we find no Missouri case where off-site use of a vehicle

owned by the alleged employer was considered to be work on the employer's premises. To the

contrary, in *K & D Auto Body*, 171 S.W.3d at 109, this court found that due to the nature of

towing services, "which obviously must be carried out at locations other than [employer's]

business premises, this factor is inapplicable," even though the drivers used tow trucks owned by

K & D Auto Body. *See also C.L.E.A.N., LLC v. Div. of Emp't Sec.*, 405 S.W.3d 613, 625-26

(Mo. App. W.D. 2013) (holding that "if the particular nature of the business at issue requires the

work to be performed off the employer's premises, the factor of whether work is performed on

the employer's premises is inapplicable," and finding that the factor was inapplicable where the

nature of residential cleaning services required that the work be carried out at locations other

than the company's business office).

17

We find the descriptive comment to this factor instructive, as well. That comment provides that "[c]ontrol over the place of work is indicated when the person or persons for whom the services are performed have the right to compel the worker to travel a designated route, to canvass a territory within a certain time, or to work at specific places as required." The independent contractor agreement and the testimony of the drivers and McNutt suggest that no such control over the drivers' routes or place of work existed. Thus, this factor is inapplicable.

> 10. *Order or Sequence Set.* If a worker must perform services in the order or sequence set by the person or persons for whom the services are performed, that factor shows that the worker is not free to follow the worker's own pattern of work but must follow the established routines and schedules of the person or persons for whom the services are performed. Often, because of the nature of an occupation, the person or persons for whom the services are performed do not set the order of the services or set the order infrequently. It is sufficient to show control, however, if such person or persons retain the right to do so.

In the questionnaire, Laclede stated that drivers are not required to follow a routine or schedule established by the business. The inherent nature of cab driving, rather than Laclede, dictates the order or sequence of the services performed by the drivers. *See K & D Auto Body*, 171 S.W.3d at 109. After receiving a dispatch from Laclede, the driver travels to the location of the customer and then transports the customer to the location designated by the customer. However, each driver has the right to refuse a fare (with the possible exception of "charge customers"). "This is consistent with independent contractor status, because upon being offered a project, independent contractors are generally 'free to accept or reject the offer.'" *Id.* (quoting *Fritts*, 992 S.W.2d at 385). Thus, this factor weighs in favor of independent contractor status.

> 11. *Oral or Written Reports.* A requirement that the worker submit regular or written reports to the person or persons for whom the services are performed indicates a degree of control.

According to the independent contractor agreement, Laclede does not require the drivers "to report or account for the fares or other amounts collected." The worker relationship

questionnaire states that drivers report to Laclede only "[t]o pay the worker's daily lease fee" and that drivers do not furnish a time record to Laclede. Consistent with that evidence, McNutt testified that drivers are not required to maintain any log books or keep track of fares and that drivers do not have to provide any reports to Laclede; similarly, the drivers testified that they were not required to keep any logs or lists of customers. We reject the Division's contention that the drivers' submission of vouchers and credit card receipts for payment of fares constituted reports within the meaning of this factor. This factor weighs in favor of independent contractor status.

> 12. *Payment by Hour, Week, Month.* Payment by the hour, week, or month generally points to an employer-employee relationship, provided that this method of payment is not just a convenient way of paying a lump sum agreed upon as the cost of a job. Payment made by the job or on a straight commission generally indicates that the worker is an independent contractor.

The Commission determined that this factor weighed "slightly in favor of an independent contractor relationship." However, its analysis of this factor focused entirely on payments made by the drivers to Laclede, i.e., the pro fee paid for lease of the cabs and the processing fee the drivers paid for voucher and credit card payments. (The Commission also stated that the payment arrangement in this case was "much like a commission.") The worker relationship questionnaire provides that the pay the drivers receive consists of "[f]ares charged for providing taxicab services to passengers" and that Laclede does not guarantee a minimum amount of pay to the driver. McNutt testified that Laclede does not pay compensation of any type to the drivers for services rendered. Berry testified that other than the charge Laclede imposed for processing credit cards and vouchers and the pro payment, he kept everything he made. Payment the drivers received consisted entirely of fares paid by customers. This is "payment by the job," which indicates that this factor weighs in favor of an independent contractor relationship.

19

13. *Payment of Business and/or Traveling Expenses.* If the person or persons for whom the services are performed ordinarily pay the worker's business and/or traveling expenses, the worker is ordinarily an employee. An employer, to be able to control expenses, generally retains the right to regulate and direct the worker's business activities.

The worker relationship questionnaire provides that Laclede does not reimburse drivers for any expenses. McNutt testified that Laclede does not reimburse drivers for gas, fares lost to bad checks, fares lost due to individuals refusing to pay, work-related clothing, costs of cleaning the cab, licenses required by the VHC, drug tests, physicals, or background checks. Drivers are solely responsible for all of these expenses. Laclede paid the expense of maintaining vehicles owned by Gateway, but not the expense of maintaining vehicles owned by the drivers. Laclede also paid to insure all of the vehicles. We find that this factor is neutral or weighs slightly in favor of an independent contractor relationship.

14. *Furnishing of Tools and Materials.* The fact that the person or persons for whom the services are performed furnish significant tools, materials, and other equipment tends to show the existence of an employer-employee relationship.

The worker relationship questionnaire provides that the drivers "may lease [Laclede's] vehicle if needed, fully equipped; pre-printed forms (carbonless credit card slips, etc)." The questionnaire states that the drivers supply "[c]lothes to meet dress code standards of the MTC, voice recorder, paper, pens, gas." The independent contractor agreement provides that the drivers pay for gas. The drivers are responsible for cleaning their vehicles. Those who own their own vehicles are responsible for maintenance on those vehicles. Laclede furnished the vehicles for most of the drivers, but the drivers were required to pay a fee to lease the vehicles. Other drivers provided their own vehicles. We find that this factor is neutral or weighs slightly in favor of an independent contractor relationship.

15. *Significant Investment.* If the worker invests in facilities that are used by the worker in performing services and are not typically maintained by employees (such as the maintenance of an office rented at fair value from an unrelated party),

20

that factor tends to indicate that the worker is an independent contractor. On the other hand, lack of investment in facilities indicates dependence on the person or persons for whom the services are performed for such facilities and, accordingly, the existence of an employer-employee relationship. Special scrutiny is required with respect to certain types of facilities, such as home offices.

We note that some drivers provided their own vehicles, which, under the independent contractor agreement, they were allowed to use for business purposes only. This represents a significant investment by those drivers. All remaining drivers leased the vehicles they operated, which may be considered an investment. Accordingly, this factor favors independent contractor status.

16. *Realization of Profit or Loss.* A worker who can realize a profit or suffer a loss as a result of the worker's services (in addition to the profit or loss ordinarily realized by employees) is generally an independent contractor, but the worker who cannot is an employee. For example, if the worker is subject to a real risk of economic loss due to significant investments or a bona fide liability for expenses, such as salary payments to unrelated employees, that factor indicates that the worker is an independent contractor. The risk that a worker will not receive payment for his or her services, however, is common to both independent contractors and employees and thus does not constitute a sufficient economic risk to support treatment as an independent contractor.

In the worker relationship questionnaire, Laclede states that the driver can incur a loss in the performance of the service. Laclede states that it "does not guarantee any amount of business, nor payment of declined/returned credit card vouchers. Worker pays a daily lease fee and incurs other expenses, which may exceed fares on any given day." Renee Rodrique, the deputy who made the initial determination of liability in this case, testified that a driver can sustain a loss. The nature of the pay arrangement between Laclede and the drivers, whereby the driver pays a flat fee to Laclede and keeps all the fares, indicates that a driver can incur a loss, if, for example, the driver does not earn enough fares to cover that day's pro payment. Conversely, the driver could realize a profit by picking up more customers. This factor indicates an independent contractor relationship.

21

17. *Working for More Than One Firm at a Time.* If a worker performs more than de minimis services for a multiple of unrelated persons or firms at the same time, that factor generally indicates that the worker is an independent contractor. However, a worker who performs services for more than one person may be an employee of each of the persons, especially where such persons are part of the same service arrangement.

The worker relationship questionnaire states that Laclede does not know whether the drivers perform similar services for others, or whether Laclede "has priority on the [driver's] time." The questionnaire states that drivers are not "prohibited from competing with the business either while performing services or during any later period." McNutt testified that a driver's license for a particular company is "only good for that company," and if the driver wants to drive for another company, "they would have to go get another license." The VHC provides that a license issued by the MTC is to be used for a specific CCN holder. However, McNutt also testified that the drivers do not drive for other cab companies because the VHC does not allow drivers to drive for two different companies. Furthermore, the signage requirements for the cabs imposed by the VHC are a further impediment to the drivers working for other firms. In addition, given the time requirements that are explicitly (in the case of shift drivers) or de facto (in the case of open shift drivers) imposed on the drivers by Laclede, it is unlikely that they would be able to perform similar services for another company regardless of the VHC's restrictions. *See Stover*, 11 S.W.3d at 695 ("Given the time requirements, it is unlikely that a driver would find it possible to run a delivery route for another employer in addition to Stover."). Because the restrictions here are primarily imposed by the VHC, rather than Laclede, we find this factor is neutral or slightly favors employee status.

18. *Making Service Available to General Public.* The fact that a worker makes his or her services available to the general public on a regular and consistent basis indicates an independent contractor relationship.

22

In the worker relationship questionnaire, Laclede states that it is unknown whether the driver represents himself or herself to the public as being in business to perform the same or similar service, whether the driver advertises or maintains a business listing in the telephone directory, trade journal, etc., and whether the driver has his or her own shop or office. However, the restrictions on the drivers' cell phone possession imposed by Laclede impedes the drivers' ability to offer their services to the public. There was no evidence that any of the relevant workers made their services available to the general public, indicating employee status. *See Quality Med. Transcription*, 91 S.W.3d at 190 (lack of evidence that transcribers regularly or consistently offered their transcription services to the general public supported employee status). We find that this factor favors employee status.

19. *Right to Discharge.* The right to discharge a worker is a factor indicating that the worker is an employee and the person possessing the right is an employer. An employer exercises control through the threat of dismissal, which causes the worker to obey the employer's instructions. An independent contractor, on the other hand, cannot be fired so long as the independent contractor produces a result that meets the contract specifications.

The independent contractor agreement provides that either party may terminate the agreement at any time, with or without cause, by delivery of written notice to the other party. But, termination of an agreement by Laclede, in most instances, requires two weeks' notice.[8] According to the worker relationship questionnaire, Laclede incurs no liability for terminating the agreement. "[T]he right to discharge without liability creates the right to control." *Merick Trucking, Inc. v. Div. of Emp't Sec.*, 902 S.W.2d 871, 875 (Mo. App. S.D. 1995). This factor supports employee status.

20. *Right to Terminate.* If the worker has the right to end his or her relationship with the person for whom the services are performed at any time he or she wishes

---

[8] Violations of provisions concerning payment of the pro fee, interference with Laclede's relationship with "charge customers," noncompliance with laws or applicable insurance policies, and prohibition on transfer or assignation of license do not require two weeks' notice; presumably, they allow for immediate termination.

without incurring liability, that factor indicates an employer-employee relationship.

As stated under factor 19 above, the independent contractor agreement provides that either party may terminate the agreement at any time, with or without cause, by delivery of written notice to the other party. Termination of the agreement by a driver requires two weeks' notice. The only reference to liability in the agreement is that "[m]id-month terminations of this Agreement by Driver will not abrogate the obligation of the Driver to make the payment(s) of the License Fee for that month or entitle him or her to a refund on any payments already made." In the worker relationship questionnaire, Laclede indicated that a driver "could terminate the services at any time without incurring a liability." McNutt testified that a driver terminating the agreement does not have to give two weeks' notice or owe the remaining payments of the license fee for the remainder of that month, and that the liability provision in the agreement is not enforced. Where a worker incurs no liability for terminating the relationship, the worker is more likely an employee.[9] *Nat'l Heritage Enters., Inc.*, 164 S.W.3d at 173. This factor indicates an employee relationship.

As noted by the Commission, the court in *K & D Auto Body* identified two additional factors to be considered in determining whether a worker is an employee or independent contractor: the provision of employee benefits and the tax treatment of the hired party. *K & D Auto Body*, 171 S.W.3d at 112.

---

[9] In *Kirksville Publishing*, we found that a similar contractual provision actually indicated an independent contractor relationship because either party could potentially have a suit for breach of contract if the requisite notice was not provided. *Kirksville Publ'g*, 950 S.W.2d at 899. In making that determination, however, we noted that "there might be some debate as to what liability a carrier would incur if he or she terminated without giving the proper notice[.]" *Id*. But here, Laclede expressly indicated in its worker relationship questionnaire that despite the contractual provisions, either party could terminate the relationship "at any time without incurring a liability." McNutt testified to the same. Thus, it would seem that, unlike the open question of potential liability discussed in *Kirksville Publishing*, there would be no liability for either party here upon termination of the agreement, even if the requisite notice was not provided.

Concerning the provision of employee benefits, the questionnaire states that drivers are not eligible for a pension, bonus, paid vacations, or sick pay. The Commission determined that Laclede provided no conventional benefits and that at most, it reduced its pro rate for certain holidays and suspended the daily pro fee for short periods if a driver gave advance notice of the need for time off. Thus, this factor suggested an independent contractor relationship. We agree with the Commission.

The Commission did not make any findings as to the tax treatment of the drivers, and there is nothing in the record discussing such treatment (other than Laclede's responses in its worker relationship questionnaire indicating that it does not withhold any taxes from amounts paid to the drivers, which weighed in favor of independent contractor status in *Fritts*, 992 S.W.2d at 385). Thus, this factor is undetermined.

An analysis of the twenty factors reveals that five factors favor employee status, seven factors favor independent contractor status, two factors could be neutral or favor independent contractor status, one factor could be neutral or favor employee status, and five factors are neutral or inapplicable. Regarding the other two factors considered in *K & D Auto Body*, one favors independent contractor status and one is undetermined. Our determination is not based solely on a numerical count of the factors. *Fritts*, 11 S.W.3d at 725. "No one factor is dispositive." *Id*. "'[T]he bedrock is still the common law agency test of the right to control the manner and means of performance.'" *Id*. (quoting *Travelers Equities Sales, Inc.*, 927 S.W.2d at 925).

While this is a very close case, we find that the drivers are independent contractors. A great deal of the "control" exerted by Laclede on the drivers was mandated by the VHC. The

control exerted by Laclede above and beyond that required by the VHC is not enough to indicate that an employer-employee relationship existed in this case.[10]

Point II is granted.

We reverse the Decision of the Commission.

_____
Karen King Mitchell, Judge

Mark D. Pfeiffer, Presiding Judge, and
Lisa White Hardwick, Judge, concur.

_____

[10] Laclede also cites IRS Publication 15-A, Employer's Supplemental Tax Guide (2014), p. 9, which provides the following example:

> Tom Spruce rents a cab from Taft Cab Co. for $150 per day. He pays the costs of maintaining and operating the cab. Tom Spruce keeps all fares that he receives from customers. Although he receives the benefit of Taft's two-way radio communication equipment, dispatcher, and advertising, these items benefit both Taft and Tom Spruce. Tom Spruce is an independent contractor.

While this does not appear to be an IRS regulation or letter ruling interpreting section 3306(i), and, as the Division points out, this is a bare bones example, it is, nevertheless, instructive.

We also find Revenue Ruling 71-572, cited by the Appeals Tribunal, instructive. That ruling provides the following example:

> The taxicab company has (a) a contractual relationship with taxicab owners who operate their own cabs and pay the company only fixed fees at regular intervals for its services in connection with the operation of their cabs, or (b) a 'lessor-lessee' relationship with taxicab operators who pay only fixed fees at regular intervals for the use of both the company's taxicabs and services. The company does not require an accounting by the owner or operator of the fees received, its interest being limited to the receipt of fixed fees at regular intervals.
> It is concluded, upon the basis of the stated facts in the instant situation, that the taxicab company does not exercise, nor does it have the right to exercise, such direction and control over the taxicab owners or the taxicab operators in the performance of their services as is necessary to establish the relationship of employer-employee under the usual common law rules.

Rev. Rul. 71-572, 1971-2 C.B. 347.

26